THE STATE OF OHIO, APPELLANT, *v.* MAYL, APPELLEE.

[Cite as *State v. Mayl,* 106 Ohio St.3d 207, 2005-Ohio-4629.]

(No. 2003–1973—Submitted January 18, 2005—Decided September 21, 2005.)

LANZINGER, J.

{¶ 1} In this case, we address the admissibility of a hospital blood-alcohol test in an aggravated-vehicular-homicide prosecution. John Mayl was charged with causing the death of another as a result of driving under the influence of alcohol. He filed a motion to suppress the results of the blood-alcohol test taken while he was being treated at the hospital after the accident. The trial court denied the motion because it found that the state need not show substantial compliance with Ohio Department of Health ("ODH") regulations, since Mayl was not charged with a DUI offense. But the court of appeals reversed and held that the testing

requirements of R.C. 4911.19(D)(1) and Ohio Adm.Code 3701–53–05 apply to aggravated vehicular homicides. *State v. Mayl,* 154 Ohio App.3d 717, 2003-Ohio-5097, 798 N.E.2d 1101.

{¶ 2} This cause is now before this court as a discretionary appeal.

{¶ 3} We conclude that in a criminal prosecution for aggravated vehicular homicide that depends upon proof of an R.C. 4511.19(A) violation, laboratory test results are admissible only if the state shows substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53, even if the test was conducted in an accredited hospital laboratory.

## Facts and Procedure

{¶ 4} On November 19, 2000, near midnight, construction worker Lorna Dingess was killed by John Mayl when he hit her with his vehicle. Mayl was also injured and was taken by ambulance to Miami Valley Hospital, where he was treated in the emergency room. The treating physician ordered a blood test, which was drawn at approximately 12:15 a.m. by a registered nurse. About 20 minutes later, Mayl refused a police officer's request to submit to a blood test to check his alcohol intake, and the officer seized Mayl's driver's license. Mayl's sample was analyzed by a lab technician, and the test results showed that Mayl had an alcohol concentration of 0.207 percent by weight in his blood. It is undisputed that Mayl's blood test was taken as part of the usual procedure for trauma care at the hospital and that it was not requested by law enforcement.

{¶ 5} Later that day, during its investigation of the traffic fatality, the Dayton Police Department requested and received Mayl's blood-alcohol test results under the provisions of R.C. 2317.022. Consequently, Mayl was arrested and indicted for aggravated vehicular homicide, a violation of R.C. 2903.06(A)(1). The indictment specified that he had caused the victim's death "as a proximate result of committing a violation of division (A) of Section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance."

{¶ 6} Mayl filed a motion to suppress his hospital blood-alcohol test,[1] contending that it did not comply with ODH requirements. Specifically, he argued that the regulations pertaining to "standards of observations, qualifications of personnel," and other provisions relating to "the taking and keeping of blood samples" were violated. After a hearing, the trial court denied the motion. Relying on *State v. Davis* (1983), 13 Ohio App.3d 265, 267, 13 OBR 329, 469 N.E.2d 83, the trial court held that R.C. 4511.19(D)(1) and Ohio Adm.Code 3701–53–05 do not

---

1. Mayl also challenged the admission of any statements he made and any other evidence seized illegally.

apply to aggravated-vehicular-homicide prosecutions. It additionally held that any defects in Mayl's test went to the weight of the evidence, not its admissibility.

{¶ 7} Mayl ultimately entered a no-contest plea to the indictment and was found guilty by the trial court. He was sentenced to four years of incarceration (two being mandatory) and his driver's license was permanently revoked. He filed a timely appeal.

{¶ 8} The Court of Appeals for Montgomery County reversed the judgment. *State v. Mayl*, 154 Ohio App.3d 717, 2003-Ohio-5097, 798 N.E.2d 1101. The court explained that a different aggravated-vehicular-homicide statute was in effect when the *Davis* court decided that any defects in blood testing went to weight rather than admissibility of evidence. Id. at ¶ 26–28. Before its amendment, R.C. 2903.06(A) provided that no person shall "recklessly" cause the death of another while operating a motor vehicle, but did not refer to any R.C. 4511.19 violation. See 135 Ohio Laws, Part I, 1922. With the amendment effective March 23, 2000, R.C. 2903.06(A) provides:

{¶ 9} "No person, while operating * * * a motor vehicle, * * * shall cause the death of another * * * in any of the following ways:

{¶ 10} "(1) As the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance."

{¶ 11} In reversing the judgment of the trial court, the appellate court determined that blood-alcohol regulations governing the drawing, handling, and testing of blood samples in DUI cases would also apply to aggravated-vehicular-homicide charges when an element of the offense is a violation of R.C. 4511.19(A) or its equivalent. Id. at ¶ 36. The court of appeals reversed the denial of the motion to suppress and the judgment of conviction, remanding the case for further proceedings.

{¶ 12} Now on appeal before us, the state of Ohio proposes that we hold that when a blood-alcohol test is taken for medical purposes by qualified medical personnel in an accredited medical laboratory within two hours of a suspected violation of R.C. 4511.19(A), the test is admissible in a prosecution that depends on proof of that violation—even though ODH regulations were not strictly followed. In other words, the state seeks to narrow the application of ODH regulations when blood-alcohol tests are taken in hospital settings for medical treatment rather than at the request of law enforcement.

{¶ 13} Mayl objects to this argument—that the admissibility of the test results should depend on the source of the request for testing—because the argument was not raised below. At oral argument the state responded that the issue was always whether the regulations apply and that it has simply refined this issue.

{¶ 14} The appellate court held generally that testing requirements of R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53 (the "ODH regulations") do apply to blood-test results in vehicular-homicide prosecutions when the results are used to show alcohol level or content as proof of an element of the offense. The court was not asked to consider whether the regulations apply depending upon which DUI section was charged: driving with a prohibited concentration (R.C. 4511.19(A)(1)(b) through (i) and (B)) or the general driving-under-the-influence section (R.C. 4511.19(A)(1)(a)). Nor was it asked to decide whether the regulations apply depending upon who requested the blood–alcohol test. But because these matters have been fully briefed and argued, we choose to clarify the purpose of R.C. 4511.19(D)(1), the pertinent ODH regulations, and their application to Mayl's situation.

## DUI Law and Test Results

{¶ 15} Before addressing the specific facts, we must put the issues in context. Mayl's aggravated-vehicular-homicide charge alleged a violation of R.C. 4511.19(A). There are several subsections to this statute. R.C. 4511.19(A)(1)(a) reads:

{¶ 16} "No person shall operate any vehicle * * * if * * *:

{¶ 17} "The person is under the influence of alcohol, a drug of abuse, or a combination of them."

{¶ 18} At the time of Mayl's offense, subsections (A)(2) through (7) prohibited operation of a motor vehicle with certain concentrations of alcohol and drugs of abuse in a person's blood, breath, or urine. See 148 Ohio Laws, Part IV, 8405. These latter sections, defining what are called "per se" offenses, were renumbered as R.C. 4511.19(A)(1)(b) through (i) in 2004. See Am.Sub.H.B. No. 163, effective September 23, 2004. R.C. 4511.19(A)(1)(a) is considered to be the general prohibition against "driving under the influence," conviction of which does not require proof of a prohibited concentration. Its language has not changed.

{¶ 19} Yet no matter under which portion of R.C. 4511.19(A) a person is charged, the state has the opportunity to offer the results of a "bodily substance" test to show either impairment—under (A)(1)(a)—or to show that the statutory concentrations of alcohol or drugs have been exceeded—under (A)(1)(b) through (i) and (B). R.C. 4511.19(D)(1) discusses when these results may be admitted in a criminal prosecution.

{¶ 20} R.C. 4511.19(D)(1) is a three-paragraph gate-keeping statute:

{¶ 21} "In any criminal prosecution or juvenile court proceeding for a violation of division (A) or (B) of this section or for an equivalent offense, the court may admit evidence on the concentration of alcohol, drugs of abuse, or a combination of them in the defendant's * * * blood * * * or other bodily substance at the

time of the alleged violation as shown by chemical analysis of the substance withdrawn within two hours of the time of the alleged violation.

{¶ 22} "When a person submits to a blood test at the request of a law enforcement officer under section 4511.191 of the Revised Code, only a physician, a registered nurse, or a qualified technician, chemist, or phlebotomist shall withdraw blood for the purpose of determining the alcohol, drug, or alcohol and drug content * * *. This limitation does not apply to the taking of breath or urine specimens. * * *

{¶ 23} "The bodily substance withdrawn shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code."

{¶ 24} The section concerning the director's authority, R.C. 3701.143, explains: "For purposes of section 4511.19 of the Revised Code, the director of health shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol, a drug of abuse, or alcohol and a drug of abuse in the person's blood, urine, breath, or other bodily substance. The director shall approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses, and issue permits to qualified persons authorizing them to perform such analyses. Such permits shall be subject to termination or revocation at the discretion of the director."

{¶ 25} The regulation that describes how a bodily substance sample shall be collected is Ohio Adm.Code 3701–53–05:

{¶ 26} "(A) All samples shall be collected in accordance with division (D) of section 4511.19 or division (B) of section 1547.11 of the Revised Code, as applicable.

{¶ 27} "(B) When collecting a blood sample, an aqueous solution of a nonvolatile antiseptic shall be used on the skin. No alcohols shall be used as a skin antiseptic.

{¶ 28} "(C) Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested.

{¶ 29} "(D) Urine shall be deposited into a clean glass or plastic screw top container which shall be capped. The collection of a urine specimen must be witnessed to assure that the sample can be authenticated. The urine specimen must be collected according to the requirements of specimen collection as set forth in the procedure manual of the laboratory that will be performing the

analysis in accordance with paragraph (D) of rule 3701–53–06 of the Administrative Code.

{¶ 30} "(E) Blood and urine containers shall be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:

{¶ 31} "(1) Name of suspect;

{¶ 32} "(2) Date and time of collection;

{¶ 33} "(3) Name or initials of person collecting and/or sealing sample.

{¶ 34} "(F) While not in transit or under examination, all urine and blood specimens shall be refrigerated."

{¶ 35} The regulation that describes testing methods is Ohio Adm.Code 3701–53–03(A):

{¶ 36} "Alcohol in blood, urine and other bodily substances shall be analyzed based on approved techniques or methods. The technique or method must have documented sensitivity, specificity, accuracy, precision and linearity. The technique or method can be based on procedures which have been published in a peer reviewed or juried scientific journal or thoroughly documented by the laboratory. Approved techniques or methods include:

{¶ 37} "(1) Gas chromatography; and

{¶ 38} "(2) Enzyme assays."

{¶ 39} The regulation that describes the required qualifications of laboratory personnel is Ohio Adm.Code 3701–53–07(A). Finally, the regulation that describes what requirements the laboratory must fulfill is Ohio Adm.Code 3701–53–06(A): "Chain of custody and the tests results for evidential alcohol and drugs of abuse shall be identified and retained for not less than three years, after which time the documents may be discarded unless otherwise directed in writing from a court. All positive blood, urine and other bodily substances shall be retained in accordance with rule 3701–53–05 of the Administrative Code for a period of not less than one year, after which time the specimens may be discarded unless otherwise directed in writing from a court."

{¶ 40} These regulations have been designed to ensure the accuracy of bodily substance test results. See *State v. Dickerson* (1986), 25 Ohio St.3d 64, 65–66, 25 OBR 86, 495 N.E.2d 6.

### The Suppression Hearing

{¶ 41} Turning now to the motion to suppress filed by Mayl, we first note that the trial court is best able to decide facts and evaluate the credibility of witnesses. Its findings of fact are to be accepted if they are supported by competent, credible evidence, and we are to independently determine whether they satisfy

the applicable legal standard. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8.

· {¶ 42} A defendant who does not file a motion to suppress test results on the basis that the state did not comply with the above procedures may not object to the admissibility of the test results at trial on those grounds. *State v. French* (1995), 72 Ohio St.3d 446, 449, 650 N.E.2d 887. In challenging his blood test on grounds of noncompliance with ODH regulations, Mayl properly filed his pretrial motion to suppress, and the state was expected to lay a foundation showing admissibility of the test results. See Id. at 452, 650 N.E.2d 887.

{¶ 43} At the suppression hearing, the state called medical personnel to testify about the procedures used. The RN who drew Mayl's blood explained that the tests were taken solely for medical reasons. "[I]t was important to us from a medical standpoint to know if, in fact, he had alcohol on board. It often interacts with the treatments that we can do, pain medication, length of stay, those types of things." His testing included a complete blood count, a coagulation profile, a metabolic, a metabolic comprehensive, an amylase/lipase, a urinalysis, and a urine drug screen, in addition to his blood-alcohol test. In drawing the blood, the RN used a nonalcohol substance to swab the skin, then used a sterile syringe and drew the blood into a vacuum-sealed glass bottle. She personally delivered it to CompuNet Clinical Laboratories, the hospital's in-house lab.

{¶ 44} Victoria Studebaker, the vice president of operations of CompuNet, testified that the lab was certified by the College of American Pathologists, was federally registered for high-complexity testing, and complied with pertinent regulations governing clinical laboratories.

{¶ 45} The medical technologist who ran Mayl's tests was certified by the Association of Clinical Pathologists. She received the container labeled with Mayl's name, the date and time it was drawn, and the initials "RN," indicating that a registered nurse had drawn it. The sample was not refrigerated for nearly one hour and 45 minutes before it was tested, but was refrigerated after the test was completed. The enzymatic assay used for the analysis in this case is commonly used in medical laboratories, and the gel VAC, a solid anticoagulant, was used according to laboratory protocol.

{¶ 46} Studebaker testified that the Hitachi chemistry analyzer used to test Mayl's sample automatically calibrates the assay when a new bottle of reagent is placed in the analyzer. Bottles of reagent are changed weekly, and the machine's calibration is checked at least once daily. Records showed proper calibration on November 18, 2000, November 19, 2000, and November 20, 2000. Since the machine registered no error code, Studebaker concluded that the machine was properly calibrated and that the results were accurate.

{¶ 47} The state also presented the trial court with evidence of a proper chain of custody and a copy of the guidelines used by the laboratory, and there was no evidence of tampering with the sample.

{¶ 48} The trial court at the suppression hearing determined that the state did not need to show compliance with the procedures in the Ohio Administrative Code and the Ohio Revised Code. The court of appeals, however, recognized that the change in the aggravated-vehicular-homicide statute now requires the state to demonstrate compliance. We agree with the appellate court that the ODH regulations requirements relate to Mayl's situation, and we hold that when results of blood-alcohol tests are challenged in an aggravated-vehicular-homicide prosecution that depends upon proof of an R.C. 4511.19(A) violation, the state must show substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53 before the test results are admissible.

{¶ 49} We used the term "substantial compliance" with respect to these statutes and corresponding administrative regulations in *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. "After a defendant challenges the validity of [alcohol] test results in a pretrial motion, the state has the burden to show that the test was administered in substantial compliance with the regulations prescribed by the Director of Health." Id. at ¶ 24. In reviewing the lower courts' interpretation of the standard, we observed: "[W]e are cognizant that if 'we were to agree * * * that any deviation whatsoever from th[e] regulation rendered the results of a [test] inadmissible, we would be ignoring the fact that strict compliance is not always realistically or humanly possible.' [*State v.*] *Plummer* [1986], 22 Ohio St.3d [292] at 294, 22 OBR 461, 490 N.E.2d 902. Precisely for this reason, we concluded in [*State v.*] *Steele* [(1977), 52 Ohio St.2d 187, 6 O.O.3d 418, 370 N.E.2d 740] that rigid compliance with the Department of Health regulations is not necessary for test results to be admissible. [Id.] at 187, 6 O.O.3d 418, 370 N.E.2d 740 (holding that the failure to observe a driver for a 'few seconds' during the 20–minute observation period did not render the test results inadmissible). To avoid usurping a function that the General Assembly has assigned to the Director of Health, however, we must limit the substantial-compliance standard set forth in *Plummer* to excusing only errors that are clearly de minimis. Consistent with this limitation, we have characterized those errors that are excusable under the substantial-compliance standard as 'minor procedural deviations.' *State v. Homan* (2000), 89 Ohio St.3d 421, 426, 732 N.E.2d 952." *Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 34.

{¶ 50} In several instances, although Mayl alleged deviations from the ODH regulations, we conclude that there was substantial compliance.[2] But Mayl also

---

2. Failure to refrigerate a sample for as much as five hours has been determined to substantially comply with Ohio Adm.Code 3701–53–05(F), which states that "[w]hile not in transit or under

challenged the lack of a permit from the Director of Health under Ohio Adm.Code 3701–53–09, and the hospital lab's failure to maintain the blood sample for one year under Ohio Adm.Code 3701–53–06(A).

{¶ 51} It is undisputed that the hospital had no permits issued by the Director of Health. Although the lab at the Miami Valley Hospital, the vice president of operations for the hospital lab, and the lab technician who tested Mayl's blood may have qualified for permits under Ohio Adm.Code 3701–53–06 and Ohio Adm.Code 3701–53–07(A), they did not apply for or have them. The vice president of operations testified that she did not believe the lab needed ODH permits, but her belief does not permit us to overlook noncompliance. Disposing of the blood sample within three to five days after testing also cannot be considered substantial compliance with Ohio Adm.Code 3701–53–06(A), which requires a lab to retain the sample for one year. This retention requirement allows for an independent test of the sample if the defendant requests it. R.C. 4511.19(D)(3). In this case, Mayl had no reasonable opportunity to make such a request.

{¶ 52} We cannot excuse the absence of the proper permits and the disposal of the sample within a matter of days as minor procedural deviations.[3] Consequently, the state has not shown substantial compliance with ODH regulations.

### The State's Argument for Nonapplicability of ODH Regulations

{¶ 53} The state argues, nonetheless, that it was not required to show that Mayl's blood test complied with ODH regulations because he submitted to the testing not at the request of a law-enforcement officer under R.C. 4511.191, but at the request of hospital staff as part of his medical treatment. In the state's view, tests conducted as part of medical treatment are not covered by R.C. 4511.19(D)(1).

---

examination, all blood and urine specimens shall be refrigerated." *State v. Plummer* (1986), 22 Ohio St.3d 292, 294–295, 22 OBR 461, 490 N.E.2d 902. Use of a gel VAC, which according to the testimony at the suppression hearing is a solid anticoagulant, complies with Ohio Adm.Code 3701–53–05(C)'s requirement that "[b]lood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested." Even if a solid anticoagulant had not been used, the process would still have comported with Ohio Adm.Code 3701–53–05(C), since the test was taken according to protocol written in the laboratory's procedure manual.

3. This is in no way a criticism of the laboratory in this case. We have every reason to believe that the lab was properly qualified to test blood for medical purposes and that the test was performed competently. We are merely stating that the ODH regulations provide the standard that must be met for the admissibility of bodily substance test results in a prosecution involving a violation of R.C. 4511.19(A) as an element of proof.

{¶ 54} Before R.C. 2317.02(B), relating to patient-physician privilege, was amended, blood-alcohol tests were not available in criminal prosecutions unless the privilege was waived by a defendant. See *State v. Smorgala* (1990), 50 Ohio St.3d 222, 553 N.E.2d 672. As of 1994, however, R.C. 2317.02(B)(2)(a) permits law enforcement to obtain those results upon proper written request, if they are relevant to a criminal offense for which a person is being investigated. 145 Ohio Laws, Part III, 5460. The state argues that because this amendment occurred well after the addition of the requirements now found in R.C. 4511.19(D)(1), see 1968 Am.Sub.S.B. No. 380, 132 Ohio Laws, Part I, 1632, the legislature intended for the records of tests taken by medical personnel to be admissible. Consequently, the state contends, blood-alcohol tests should be admitted just as any other medical test might be, subject to proper foundation with cross-examination of any expert witness. See, e.g., Evid.R. 702(C) and 803(6). The argument is that tests performed for medical reasons are inherently reliable and that their evidentiary weight may be measured at trial through cross-examination.

{¶ 55} Although we may agree that this is good public policy, it is not what the statute says. R.C. 2317.02(B)(2) simply waives patient-physician privilege when law enforcement seeks to obtain certain test results. It does not set forth the standard by which the test results will be deemed reliable to establish proof beyond a reasonable doubt. R.C. 4511.19(D)(1) and regulations contained in Ohio Adm.Code Chapter 3701–53 do that. Nothing in R.C. 2317.02(B)(2) exempts a hospital from complying with the testing standards contained in R.C. 4511.19(D)(1). We hold that when a blood-alcohol test is not requested by law enforcement but is administered in connection with medical treatment by qualified medical personnel and analyzed in an accredited laboratory, the state must show substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53 before the test results are admissible in a prosecution depending upon proof of an R.C. 4511.19(A) violation.

### Hospitals Are Not Statutorily Exempt from ODH Compliance

{¶ 56} No portion of R.C. 4511.19(D)(1) distinguishes between the admissibility of test results obtained by hospitals and the admissibility of those obtained by law enforcement. The first paragraph of R.C. 4511.19(D)(1) explains that certain test results of bodily substances are admissible in R.C. 4511.19(A) or (B) prosecutions, if they are taken within two hours after the offense. There is no distinction between prosecutions for "per se"[4] or "under the influence"[5] violations. The second paragraph of R.C. 4511.19(D)(1) details certain safeguards for the drawing

---

4. R.C. 4511.19(A)(1)(b) through (i) and (B).

5. R.C. 4511.19(A)(1)(a).

of blood when law enforcement requests a test under R.C. 4511.191, the implied-consent statute. The third paragraph states that the bodily substance must be "analyzed in accordance with methods approved by the director of health," and the testing must be done by someone who possesses a "valid permit issued by the director" pursuant to R.C. 3701.143. The dissent contends that the entirety of R.C. 4511.19(D)(1) should be limited to situations in which law enforcement has requested a blood test under R.C. 4511.191. If the legislature had intended that result, it could have prefaced R.C.4511.19(D)(1) with that limitation. Instead, it simply limited the manner in which blood is drawn at the request of law enforcement. Thus, it appears that R.C. 4511.19(D)(1) covers all prosecutions requiring proof of a violation of R.C. 4511.19(A) or (B). It does not matter whether the prosecution relates to a violation of the per se sections or the under-the-influence section. It also does not matter who requests the test.

{¶ 57} The case on which the state relies, *State v. Brand,* 157 Ohio App.3d 451, 2004-Ohio-1490, 811 N.E.2d 1156, held that the requirements of R.C. 4511.19(D) do not apply when a blood-alcohol test is not requested by law enforcement but by medical personnel for presumed medical purposes. The court was mistaken in reading language in the second paragraph of R.C. 4511.19(D)(1) as limiting ODH regulations to blood tests taken at the request of law enforcement, id. at ¶ 25–27, and we therefore disapprove similar holdings.[6] The second paragraph of R.C. 4511.19(D)(1) simply specifies that blood should be drawn by a qualified person when police request the test.

{¶ 58} The accuracy and reliability of bodily substance tests do not depend on who requests them. In *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 32, we explained that the Director of Health, and not the judiciary, has been entrusted with ensuring the reliability of blood-alcohol test results through regulations—precisely because the former possesses the scientific expertise that judges do not have.

{¶ 59} We will not retreat from our stance in *Burnside* and create an exception for testing done as part of medical treatment. The Director of Health may fashion specific regulations for bodily substance tests performed by hospitals or similar facilities for purposes of medical treatment or diagnosis. These might include different retention rules and certification rules for hospital, as compared to forensic, labs. We, however, decline to invent an exemption the legislature has not created and to add regulations the director has not promulgated.

---

6. The following cases are also incorrect on this point. *State v. Lloyd* (Mar. 26, 2003), Knox App. No. 02–CA–33; *State v. Slageter* (Mar. 31, 2000), Hamilton App. No. C–990584, 2000 WL 331633; *State v. Herrig* (Apr. 16, 1999), Wood App. No. WD–98–047, 1999 WL 247095; *Middletown v. Newton* (1998), 125 Ohio App.3d 540, 544–545, 708 N.E.2d 1086; *State v. Quinones* (Feb. 14, 1996), Lorain App. No. 95CA006084, 1996 WL 62578.

### Conclusion

{¶ 60} The state did not show substantial compliance with ODH regulations at the suppression hearing. Proper certification of the lab and hospital personnel and retention of the sample were needed for results of Mayl's blood-alcohol test to be admissible in an aggravated-vehicular-homicide case. It does not matter that the sample was taken during medical treatment.

{¶ 61} Until the legislature creates a specific exemption, hospital tests of bodily substances—to be admissible in prosecutions that have as an element of proof a violation of R.C. 4511.19(A), including prosecutions under R.C. 2903.06(A)(1)—must substantially comply with Ohio Adm.Code Chapter 3701–53 and R.C. 4511.19(D)(1).

{¶ 62} Our review of the statutes and administrative regulations involved leads us to conclude that the appellate court correctly reversed the denial of Mayl's motion to suppress blood-alcohol test results and the resulting judgment of conviction. The judgment of the Court of Appeals for Montgomery County is affirmed.

Judgment affirmed.

MOYER, C.J., PFEIFER and O'DONNELL, JJ., concur.

RESNICK, LUNDBERG STRATTON and O'CONNOR, JJ., dissent.

---

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 63} I believe that the majority misinterprets the reach of R.C. 4511.19(D)(1). In my view, a fundamental distinction between tests for alcohol or drugs done at the request of a police officer and tests done for medical treatment is established when that statute and several other relevant statutes are interpreted together. In failing to recognize this distinction, the majority engages in an extensive discussion of issues that are beyond the scope of this case. I dissent.

{¶ 64} Initially, I agree with the majority that the state has not waived the opportunity to present its argument that the last sentence of R.C. 4511.19(D)(1) is inapplicable in the circumstances of this case. Due to the way this case has progressed on appeal, that issue remains a valid one for this court's consideration. Unlike the majority, however, I would find the state's argument persuasive. Furthermore, while the majority relegates discussion of that issue to a few paragraphs near the end of its opinion, I view the issue as completely dispositive of this case.

{¶ 65} The majority discusses the three unnumbered paragraphs of R.C. 4511.19(D)(1) and rejects the state's argument that the third paragraph of the statute does not apply to medical tests performed for diagnosis or treatment.

The majority holds that even when a blood-alcohol test is not requested by a law-enforcement officer, the medical test must substantially comply with R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53 for the test results to be admissible.

{¶ 66} The first paragraph of R.C. 4511.19(D)(1) provides that in any criminal prosecution for a violation of R.C. 4511.19(A), a "court may admit evidence on the concentration of alcohol * * * in the defendant's * * * blood * * * at the time of the alleged violation as shown by chemical analysis of the substance withdrawn within two hours of the time of the alleged violation."

{¶ 67} The second paragraph provides, "When a person submits to a blood test at the request of a law enforcement officer under section 4511.191 of the Revised Code" [the "implied consent" statute], only certain medical professionals, such as a physician or a registered nurse, shall withdraw the blood. The second paragraph specifies that this provision does not apply to the taking of breath or urine specimens.

{¶ 68} The third paragraph provides, "The bodily substance withdrawn shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code."

{¶ 69} The majority states, "R.C. 4511.19(D)(1) covers all prosecutions requiring proof of a violation of R.C. 4511.19(A) or (B). * * * It * * * does not matter who requests the test."

{¶ 70} In my view, not only does the last paragraph of R.C. 4511.19(D)(1) not apply to this case, that entire statute has no application. That is due to the General Assembly's 1994 enactment of R.C. 2317.02(B)(2), which, in apparent response to this court's decision in *State v. Smorgala* (1990), 50 Ohio St.3d 222, 553 N.E.2d 672, provides that the physician-patient privilege does not apply in R.C. 4511.19 prosecutions if law-enforcement officers follow procedures spelled out in R.C. 2317.02(B)(2) to obtain medical test results from a health care provider.[7] See R.C. 2317.02(B)(2)(a). In addition, R.C. 2317.02(B)(2)(b) authorizes courts to admit into evidence in criminal prosecutions certified copies of those results.

{¶ 71} Furthermore, as relevant to this case, R.C. 2317.022(B) provides, "If an official criminal investigation has begun regarding a person * * *, any law enforcement officer who wishes to obtain from any health care provider a copy of any records the provider possesses that pertain to any test or the result of any test administered to the person to determine the presence or concentration of

---

7. See 1994 Am.Sub.H.B. No. 335, 145 Ohio Laws, Part III, 5460, effective December 9, 1994.

alcohol * * * in the person's blood * * * shall submit to the health care facility a written statement," and supplies the text of a form for the officer to complete and submit. R.C. 2317.022(C) states, "A health care provider that receives a written statement of the type described in division (B) of this section shall comply" with R.C. 2317.02(B)(2).

{¶ 72} I essentially agree with the view of R.C. 4511.19(D)(1) expressed in *State v. Brand*, 157 Ohio App.3d 451, 2004-Ohio-1490, 811 N.E.2d 1156, a case with very similar facts. In that case, the court's opinion states:

{¶ 73} "At the hospital, Officer Beebe asked Brand to give a blood sample, and she refused. Hospital personnel later took a sample of Brand's blood, presumably for medical purposes. Though it is not clear from the record, we assume that the state then obtained the blood-alcohol level of Brand's blood through R.C. 2317.02(B)(2)(a). That statute specifically waives the doctor-patient privilege in DUI criminal investigations and allows law-enforcement officers to obtain the results of any test concerning alcohol or drug concentration that was administered by medical personnel.

{¶ 74} "Therefore, because Brand did not submit to a blood test at the request of a law enforcement officer, the results of her blood test were not subject to the regulations of R.C. 4511.19(D). The Fifth, Ninth, and Twelfth Appellate Districts have come to this same conclusion in similar cases. [See *State v. Lloyd* (Mar. 6, 2003), 5th Dist. No. 02–CA–33; *State v. Quinones* (Feb. 14, 1996), Lorain App. No. 95CA006084, 1996 WL 62578; *Middletown v. Newton* (1998), 125 Ohio App.3d 540, 545, 708 N.E.2d 1086.] The Fifth Appellate District has stated that while R.C. 4511.19(D) provides a specific procedure when a blood test is taken at the request of a law enforcement officer, R.C. 2317.02(B)(2)(a) omits any such procedure after a criminal investigation has begun. [See *State v. Lloyd,* supra.]

{¶ 75} "* * *

{¶ 76} "Therefore, we hold that because Brand's blood sample was not taken at the request of a law enforcement officer, the state did not have the burden to prove substantial compliance with the testing procedures of R.C. 4511.19(D). Accordingly, we hold that Brand's blood test was admissible and sustain the state's first assignment of error." (Footnotes omitted.) *Brand* at ¶ 26–27, 31.

{¶ 77} The majority rejects *Brand* and the cases cited therein, as well as *State v. Slageter* (Mar. 31, 2000), Hamilton App. No. C–990584, 2000 WL 331633, and *State v. Herrig* (Apr. 16, 1999), Wood App. No. WD–98–047, 1999 WL 247095, declaring the reasoning in the cases to be "mistaken" and "incorrect."

{¶ 78} I believe that a close reading of *Brand,* particularly the paragraphs quoted above, supports a view that that court was not simply conducting a narrow textual consideration of the terms of R.C. 4511.19(D)(1) as contained within the

second and third paragraphs of that statute. As I view *Brand*, the court was considering the multiple relevant statutes implicated by the issue and reached the correct result given the interplay of all those statutes. I believe that the provision of the second paragraph of R.C. 4511.19(D)(1) that states, "When a person submits to a blood test at the request of a law enforcement officer under section 4511.191 of the Revised Code," is most appropriately read to limit the entirety of R.C. 4511.19(D)(1) to that situation. Therefore, R.C. 4511.19(D)(1) simply has no application to a blood-test result obtained pursuant to R.C. 2317.02(B)(2).

{¶ 79} R.C. 4511.19(D)(1) predates R.C. 2317.02(B) and 2317.022 [8] and is superseded by those statutes when a blood test that was conducted for medical treatment is offered into evidence. See, in particular, R.C. 2317.02(B)(2)(b), which specifically authorizes a trial court to admit medical-test results into evidence, with no reference to the limitations of R.C. 4511.19(D)(1). In other words, R.C. 4511.19(D)(1) applies only when a test is requested by a law-enforcement officer pursuant to R.C. 4511.191, as the second paragraph of R.C. 4511.19(D)(1) makes clear.

{¶ 80} Applying the same reasoning that was applied in *Brand*, I would conclude that, because Mayl's blood sample was not taken at the request of a law-enforcement officer, the test result should be admissible, with any objections to the tests going to the weight of the evidence. I view the majority's application of *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, as flawed, as *Burnside* is distinguishable because it involved a blood test obtained under R.C. 4511.191's implied-consent provisions. For the same reason, the majority's discussions of the requirements of R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53, and of substantial compliance with those provisions, are irrelevant. Finally, since I believe that the test result is admissible, I conclude that this case does not present the issue of whether R.C. 4511.19(D)(1) requirements apply to R.C. 2903.06(A)(1) cases (the issue decided in *State v. Davis*, which was relied on by the trial court below, but which apparently has been abandoned by the state and so not specifically addressed by the majority).

{¶ 81} Not long after the Second Appellate District issued its decision reversing the judgment of the trial court in the instant case, that court decided *State v. Wells*, Greene App. No. 2003-CA-68, 2004-Ohio-1026, 2004 WL 405809. In *Wells*, the court declined to find that R.C. 4511.19(D)(1) applies only when a blood sample is withdrawn at the request of a law-enforcement officer, following the lead of other courts that "have addressed analyses by clinical laboratories in the

---

8. The provisions now found in R.C. 4511.19(D)(1) were enacted in 1968. See Am.Sub.S.B. No. 380, 132 Ohio Laws, Part I, 1632. R.C. 2317.02(B)(2) and 2317.022 were enacted in 1994. See 1994 Am.Sub.H.B. No. 335, 145 Ohio Laws, Part III, 5460 and 5463, effective December 9, 1994.

context of whether the laboratory has substantially complied with [Ohio Department of Health] regulations, not whether the regulations apply at all." Id. at ¶ 53. However, the court speculated that holding the regulations inapplicable may actually be the result intended by the General Assembly when the totality of the relevant statutes and Ohio Administrative Code provisions is considered:

{¶ 82} "R.C. 4511.19 and the regulations, read together, could suggest that only blood analyses performed at the request of law enforcement officers are required to comply with ODH regulations. This interpretation would comport with the legislature's actions in amending R.C. 2317.02(B)(1)(b) to provide that physician-patient privilege does not prevent the admission of alcohol and drug test results in any criminal prosecution." Id.

{¶ 83} The *Wells* court went on to suggest that the General Assembly should revisit this area of the law:

{¶ 84} "Clearly, this issue is in need of legislative clarification. The unfortunate result of this apparent legislative oversight is that law enforcement may be unable to use the results of blood tests performed by certified clinical laboratories in many of those DUI cases where the defendant has done the greatest harm, i.e., aggravated vehicular homicide cases. Surely, this was not the goal of the legislature. As recognized in *Quinones* [supra, Lorain App. No. 95CA006084], by amending R.C. 2317.02(B)(1)(b), the Ohio legislature seemingly had expressed an intent to make clinical test results available in DUI prosecutions." *Wells* at ¶ 54.

{¶ 85} I disagree with *Wells* to the extent that it rejects the conclusion of *Brand, Quinones,* and other appellate cases mentioned above that R.C. 4511.19(D)(1) has no application to blood samples drawn for medical treatment. However, I do agree with the sentiment expressed in *Wells* that the General Assembly should consider revising R.C. 4511.19(D)(1) or 2317.02(B)(2) to clarify whether R.C. 4511.19(D)(1) is intended to apply to R.C. 2317.02(B)(2) cases, especially given that the majority has definitively found R.C. 4511.19(D)(1) applicable even when the test is conducted for medical treatment.

{¶ 86} In conclusion, I would reverse the judgment of the court of appeals. I would find that the trial court reached the correct result in denying Mayl's motion to suppress, even though the trial court's reasoning was faulty, and so specifically disagree with the court of appeals regarding the admissibility of the blood-test results. However, because the court of appeals found two of Mayl's assignments of error moot and declined to address them, and those assignments are unrelated to the admissibility of the test results, I would remand the cause to the court of appeals for further consideration. Because the majority decides this case differently, I dissent.

LUNDBERG STRATTON and O'CONNOR, JJ., concur in the foregoing dissenting opinion.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram, Assistant Prosecuting Attorney, for appellant.

Flanagan, Lieberman, Hoffman & Swaim and Richard Hempfling, for appellee.

Rittgers & Rittgers, Charles H. Rittgers, and James A. Dearie; and D. Timothy Huey, urging affirmance for amicus curiae, Ohio Association of Criminal Defense Lawyers.