[Cite as *State v. Gaston*, 2018-Ohio-4575.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | CASE NO. 2017-L-109 |
| TIMOTHY MARKEL GASTON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2014 CR 000246.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Russell S. Bensing* and *Scott J. Friedman,* 600 The IMG Building, 1360 East Ninth Street, Cleveland, OH 44114 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Timothy Markel Gaston, appeals from the judgment of the Lake County Court of Common Pleas, convicting him, after a trial by jury, of aggravated murder and aggravated burglary, each with a firearm specification. At issue is whether the trial court erred in denying appellant's motion to suppress evidence and whether the trial court erred in overruling appellant's motion to dismiss for violation of his right to a speedy trial. For the reasons discussed in this opinion, we affirm.

**{¶2}** On the evening of July 25, 2013, Matthew Hammond and his girlfriend, Katalina Mudrick, had fallen asleep on a mattress in the living room of their mobile-home trailer. At approximately 4:00 a.m. the next morning, they were awakened to the sound of their screen door being broken. Mr. Hammond leapt out of bed and went towards the door. Two men broke in and pushed Mr. Hammond back onto the mattress and began beating him. The two men pulled Mr. Hammond into the kitchen and, as he attempted to stand, one of the assailants shot him. The attackers fled the trailer. Ms. Mudrick called 911 and, when police arrived, Mr. Hammond had already passed away.

**{¶3}** An investigation commenced and Detective Brian Butler of the Lake County Sheriff's Office began to collect leads on the crime. Det. Butler received a tip from a resident of the trailer park which led him to begin searching for a white Chevy Impala, the vehicle that may have been used during the murder. The detective ultimately received information relating to a vehicle matching the description, located at the Seneca Grove Apartments in Painesville, Ohio. He subsequently obtained the surveillance video from the apartment of the morning in question. The video revealed a Chevy Impala entering the apartment complex at 1:12 on the morning of July 26, 2013. At 2:29 a.m., appellant, Marshaun Ligon, and Antonio Askew entered the "G Building" in the complex. At approximately 3:38 a.m., three individuals exited unit 62 of the "G Building," two of the three were identified as Mr. Ligon and Mr. Askew. The surveillance video depicted the Impala leaving the complex at 3:40 a.m. and returning sometime after 5:00 a.m.

**{¶4}** Det. Butler noted the license-plate number and determined the vehicle belonged to one Jennifer Ramian. Ms. Ramian ultimately gave the detective permission

2

to search the vehicle, and the Sheriff's Office crime-scene unit discovered blood on the back passenger seat area.  The blood was later confirmed as that of Mr. Hammond.

{¶5}  Based upon the video and the information linking appellant to the apartment on the morning in question, Det. Butler attempted to locate him.  Det. Butler later learned appellant was living in Knoxville, Tennessee.

{¶6}  After arriving in Knoxville with Captain Ron Walters, Det. Butler spoke with Investigator Ed Kingsbury, of the Knoxville Police Department.  The Ohio officers explained they wished to interview appellant as a person of interest in a murder investigation.  In the course of the discussion, they revealed appellant had been adjudicated delinquent for a juvenile sex offense.  Investigator Kingsbury advised them that, under Tennessee law, sex offenders are required to register with the state.  Appellant had not registered.  Ultimately, Investigator Kingsbury, along with two U.S. Marshalls, visited appellant's apartment in Knoxville.  The Ohio officers accompanied them, but remained out of sight in the complex's parking lot.

{¶7}  Appellant answered his door and Investigator Kingsbury explained the reason why he and the Marshalls were there.  He asked appellant to accompany him to the police department to determine whether he was required to register.  Appellant agreed and entered the back seat of the officers' unmarked vehicle.  Investigator Kingsbury emphasized appellant was not required to accompany him and, at no time, was his freedom of movement restrained.  Upon arriving at the department, appellant was placed in Investigator Kingsbury's office, located in the lobby of the building.  Investigator Kingsbury subsequently spoke with, among others, the Knoxville District Attorney's Office and concluded appellant was not required to register as a sexual

offender. Upon drawing this conclusion, Investigator Kingsbury left the office and advised Det. Butler and Capt. Walters they could speak with appellant.

{¶8} Det. Butler and Capt. Walters approached appellant, identified themselves, explained the reason for their presence, and commenced their interview. The Ohio officers were not aware that appellant was not required to register and assumed he had been arrested by Officer Kingsbury. They disclosed this belief to appellant and provided him with *Miranda* warnings, which he acknowledged and proceeded with the interview. Notwithstanding his assumption regarding appellant's arrest, Det. Butler noted appellant was not restrained in any way and he possessed his cell phone, which he used periodically throughout the interview.

{¶9} During the interview, appellant admitted he was at the scene of the murder, and that Mr. Ligon and Mr. Askew were involved. He stated he and the other two men intended on breaking into the trailer to steal money because they believed Mr. Hammond kept a fair amount of cash on hand. Once they arrived, appellant maintained Mr. Askew remained in the vehicle and Mr. Ligon broke into the residence. He first maintained he remained on the porch. Appellant then admitted he entered the trailer to grab Mr. Ligon approximately 15 seconds after he broke into the residence. Upon entering, he stated he observed a struggle between Mr. Hammond and Mr. Ligon. When he realized he could not compel Mr. Ligon to leave, appellant claimed he left the trailer and, while leaving, he heard a gun fire. He subsequently moved to Tennessee.

{¶10} Appellant was indicted on fifteen counts: One count of aggravated murder; two counts of murder; three counts of kidnapping; two counts of aggravated burglary; one count of burglary; two counts of aggravated robbery; two counts of

4

robbery; and two counts of felonious assault. Each of the charges carried either a one or three-year firearm specification. Appellant pleaded not guilty and defense counsel filed a motion to suppress appellant's statement made to the Lake County Sheriff's deputies.

{¶11} In his motion to suppress, appellant asserted his statements during his interview with Det. Butler and Capt. Walters were obtained as a result of or subsequent to an unlawful arrest. In particular, he asserts he was arrested by Tennessee officers for failing to register as a sex offender in Tennessee. And, this unlawful arrest was occasioned by the Lake County officers contacting the Tennessee authorities to assist in apprehending him. He argued Tennessee authorities worked in coordination with the Lake County officers to improperly secure his arrest in order for the Ohio officers to interrogate him regarding the murder of Mr. Hammond.

{¶12} In response, the state argued that, even though the Ohio officers erroneously advised appellant he was under arrest by the Knoxville Police Department, he was never actually under arrest. Instead, the state maintained appellant voluntarily accompanied the Tennessee officers to their department to determine whether he should be registered. Thus, the state concluded, because there was no initial arrest, the evidence gleaned from the interview was not tainted and should not be suppressed.

{¶13} The trial court held a hearing on the motion and ultimately denied the same, concluding appellant was neither under arrest when he spoke with Investigator Kingsbury, nor when he was interviewed by the Lake County officers. Appellant also filed a motion for discharge for violation of his right to speedy trial. The trial court denied the motion.

5

{¶14} After plea negotiations fell through, the case proceeded to trial. The jury found appellant guilty on all counts. At sentencing, the trial court found all counts merged with the aggravated murder count, with the exception of aggravated burglary with use of a deadly weapon. The court imposed a sentence of life imprisonment with the possibility of parole after thirty years on the aggravated murder count and an 11-year term of imprisonment on the aggravated burglary count. The firearm specifications on these offenses were ordered to run consecutively to them and to each other; and the convictions for aggravated murder and aggravated burglary were ordered to run consecutively, for an aggregate term of life imprisonment with parole eligibility after 47 years. He now appeals, assigning two errors for our review. His first asserts:

{¶15} "The trial court erred in denying Defendant's motion to suppress his statement."

{¶16} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. At a hearing on a motion to suppress, the trial court functions as the trier of fact. Accordingly, the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). The trial court's "findings of fact are to be accepted if they are supported by competent, credible evidence," whereas the appellate court is "to independently determine whether [the facts as determined by the trial court] satisfy the applicable legal standard." *State v. Mayl,* 106 Ohio St.3d 207, 2005-Ohio-4629, ¶41; *State v. Yu,* 11th Dist. Geauga Nos. 2014-G-3209 and 2014-G-3210, 2015-Ohio-637, ¶7.

{¶17} On appeal, appellant first asserts Investigator Kingsbury's explanation that appellant voluntarily accompanied him to the Knoxville Police Department is suspect. Appellant asserts the officer could have confirmed that he was not required to register without his presence at the department. And, appellant contends, the circumstances of Investigator Kingsbury's request indicate appellant was essentially compelled to accompany him; that is, the Tennessee officers were armed and wearing tactical vests. In appellant's view, a reasonable person would not feel free to remain in the residence.

{¶18} The law recognizes three types of police-citizen encounters: consensual encounters, *Terry* stops, and arrests. *State v. Peacock,* 11th Dist. Lake No. 2002-L-115, 2003-Ohio-6772, ¶14, citing *State v. Taylor*, 106 Ohio App.3d 741, 747–49 (2d Dist.1995). "'[N]ot all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred' within the meaning of the Fourth Amendment." *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶11 (10th Dist.) quoting *Terry v. Ohio*, 392 U.S. 1, 19.

{¶19} The Supreme Court of Ohio has set forth four factors that must be present for an arrest to occur. To wit: "(1) An intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." *State v. Barker*, 53 Ohio St.2d 135 (1978), paragraph one of the syllabus.

{¶20} At the hearing, Investigator Kingsbury testified he and two U.S. Marshalls knocked on appellant's door and, when he answered, they introduced themselves. The

7

investigator explained his role at the department was ensuring sex offenders in the county were in compliance with registration requirements. After further advising appellant he was aware of appellant's juvenile delinquency adjudication for a sex offense, the investigator asked appellant to accompany him to the department to determine whether he was required to register. Investigator Kingsbury stated appellant was not nervous, answered all his questions, and agreed to return to the department with him. Appellant rode with the investigator in his unmarked truck, was not restrained, and the two engaged in friendly conversation. Upon arrival at the department, appellant sat in the investigator's office and, according to the investigator, was free to leave at any time. And, at the hearing, the investigator testified that, in taking appellant to the department, he "was not taking him into custody for anything." Instead, the investigator stated, if it turned out he was required to register, he wanted him personally available to begin the process.

{¶21} The foregoing demonstrates that the investigator had no intent, throughout the entirety of the encounter, to arrest appellant. His purpose was to inquire into whether appellant needed to register and, if so, commence the process. Appellant accompanied the investigator without objection and, because he was not actually restrained or otherwise forced to cooperate, it is reasonable to conclude he understood he was not under arrest. Appellant disputes the investigator's motivations and advances a different construction of his intentions. The trial court, however, as the arbiter of witness' credibility, elected to believe Inspector Kingsbury's testimony. The officers did not compel appellant, through physical force or some alternative outward demonstration of authority, to join them. The facts and circumstances show that

8

appellant voluntarily accompanied the officers to the department without any means of coercion. We find no error in the trial court's conclusion that appellant was not unlawfully arrested by Investigator Kingsbury.

{¶22} Next, appellant argues neither Investigator Kingsbury nor Capt. Walters and Det. Butler possessed probable cause to arrest appellant prior to the latter's interview. Appellant's assertion presupposes an arrest occurred either by the investigator or the Ohio officers. Because we conclude appellant was not the subject of an unlawful arrest by Investigator Kingsbury, no probable cause analysis is necessary. Similarly, even though the Ohio officers mistakenly advised appellant he was under arrest by the Knoxville police and then *Mirandized* him, these points do not imply he was under arrest at the time the interview commenced.

{¶23} Det. Butler described appellant as a person of interest that was connected to the Hammond murder investigation. He testified he and Capt. Walters believed appellant had information that could assist the investigation. He did not, however, testify he had probable cause to arrest appellant for the murder. In this respect, at the commencement of the interview, Det. Butler did not have the requisite intent to arrest appellant at the outset of the interview. Hence, Det. Butler did not need probable cause to speak with appellant.

{¶24} Moreover, after Investigator Kingsbury was advised that appellant was not required to register in Tennessee, he testified he asked appellant if he would be willing to speak with Det. Butler and Capt. Walters. Appellant agreed to do so. Moreover, when the Ohio officers greeted appellant, they also asked him if they could interview him. Again, appellant agreed. And, according to Investigator Kingsbury, appellant did

9

so in a "friendly" fashion. These points demonstrate that appellant, upon commencement of the interview with the Ohio officers, understood he was not under arrest, but simply speaking with them pursuant to their request. We therefore conclude no probable cause was necessary for the Ohio officers to conduct the interview with appellant.

{¶25} Appellant finally asserts the issuance of *Miranda* warnings by the Ohio officers did not remove the taint of the unlawful arrest. Because we conclude appellant was never arrested, as a matter of law, his statements to the officers were never tainted. The *Miranda* warnings were only issued as a prophylactic measure because the Ohio officers were under the erroneous assumption that appellant was charged and arrested for failing to register as a sexual offender. As noted above, however, this assumption and the subsequent formal issuance of *Miranda* warnings did not transmogrify the voluntary interview into an arrest.

{¶26} Appellant's first assignment of error lacks merit.

{¶27} For his second assigned error appellant contends:

{¶28} "The trial court erred in denying Defendant's motion for discharge for violation of Defendant's right to speedy trial."

{¶29} The Supreme Court of Ohio has stated: "* * * R.C. 2945.71 *et seq.,* constitute a rational effort to enforce the constitutional right to a public speedy trial of an accused charged with the commission of a felony or a misdemeanor and shall be strictly enforced by the courts of this state." *State v. Pachay*, 64 Ohio St.2d 218 (1980), syllabus. Hence, "for purposes of bringing an accused to trial, the statutory speedy trial provisions of R.C. 2945.71, *et seq.,* and the constitutional guarantees found

10

in the United States and Ohio Constitutions are coextensive." *State v. O'Brien*, 34 Ohio St.3d 7, 9 (1987).

{¶30} A criminal defendant, however, may waive his or her constitutional right to a speedy trial, provided such waiver is knowingly and voluntarily made. *Barker v. Wingo,* 407 U.S. 514, 529 (1972). Similarly, a defendant, or his or her counsel, may validly waive the speedy trial provisions of R.C. 2945.71, *et seq. State v. McBreen* (1978), 54 Ohio St.2d 315 (1978). It therefore follows that "a knowing, voluntary, express written waiver of an accused's statutory speedy trial rights may equate with a waiver of the coextensive constitutional rights, at least for the time period provided in the statute." *O'Brien*, *supra*. "Following an express, written waiver of unlimited duration by an accused of his right to a speedy trial, the accused is not entitled to a discharge for delay in bringing him to trial unless the accused files a formal written objection and demand for trial, following which the state must bring the accused to trial within a reasonable time." *Id.*, at paragraph two of the syllabus.

{¶31} On May 30, 2014, appellant filed a written waiver of his constitutional and statutory rights to a speedy trial. The waiver was not conditional and, as a result, the trial court properly construed the waiver as unlimited in nature. The waiver was signed by both appellant and witnessed by his attorney. And there is nothing in the record to suggest the waiver was not knowing and voluntary. And appellant neither formally demanded that a trial date be set nor did he specifically file a motion to withdraw the waiver. We therefore conclude the waiver was a valid and unlimited waiver of appellant's constitutional and statutory right to a speedy trial.

**{¶32}** Appellant asserts the waiver was not unlimited because the trial court, in three separate judgment entries granting continuances, noted "time [is] charged to the Defendant." The trial court's notation does not limit or negate appellant's knowing and voluntary relinquishment of his constitutional and statutory rights. To the contrary, the trial court's statement could be reasonably construed as a pro forma or boilerplate advisement that is placed on all judgments granting a criminal defendant's motion. Because appellant's written waiver was knowingly and voluntarily made, was of unlimited duration, and he did not object and demand a trial, pursuant to *O'Brien*, the speedy trial provisions in R.C. 2945.71 *et seq.,* do not apply. The trial court did not err when it concluded appellant was not entitled to discharge, pursuant to R.C. 2945.73(B).

**{¶33}** In denying appellant's motion to discharge for violation of his rights to a speedy trial, however, the trial court construed the motion as a withdrawal of the unlimited waiver and as a demand for trial (even though no demand was actually filed). In doing so, the trial court considered whether, at the time appellant filed the motion/objection, whether appellant would be brought to trial within a reasonable time. The court observed appellant's constructive revocation of his waiver was filed on March 30, 2017 and, pursuant to the attorneys' agreement, trial was set for May 30, 2017.

**{¶34}** In *Barker, supra,* the United States Supreme Court "set forth a balancing test that considers the following factors to determine whether trial delays are reasonable under the Sixth and Fourteenth Amendments to the United States Constitution: 'Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶38 quoting *Barker, supra,* at 530.

12

{¶35} With respect to the first factor, 61 days passed from the filing of the motion and the date of trial. In its judgment entry, the trial court made the following observations on the total length of delay in setting a trial date, even though this delay is not the focus of the *O'Brien* analysis:

{¶36} [A]side from motion practice and discovery issues that were outlined by the State of Ohio, the parties in this case engaged in extensive and lengthy plea bargaining negotiations throughout the pendency of this case. Even as of the beginning of this year, as indicated by the State in its motion to set trial date, filed on February 24, 2017, the parties were still attempting to resolve this matter. And while the Court did not participate in the plea negotiations, the Court was asked to afford the parties time to make these attempts at resolving the case. Inasmuch as there was a waiver of speedy trial in effect, the Court went along with their request. To compound matters, there have also been three attorneys involved in this case [for the Defendant]. Upon the entry of the appearance of each new attorney, the Court provided time for the new attorneys to get involved in the case.

{¶37} As for the reasons for setting the trial on May 30, 2017, the Court first again notes that the waiver of speedy trial was still in effect when this trial date was set by the Court. Second the Court also notes that prior to scheduling the trial, the State had filed a motion to set trial date. In said motion, the State advised the Court that the State had provided the Defendant's new attorney with all of the discovery, had met with Defendant's new attorney at the crime laboratory to review forensic evidence, and had engaged in lengthy negotiations in an attempt to resolve the case. The Stated further advised the Court that the Defendant had just recently rejected the State's final offer to resolve the case and that the case needed to be set for trial. The Court was also advised that the trial would take at least five full days to try. As a result, this Court soon thereafter, instead of just setting that trial date sua sponte without any input from counsel as to availability, contacted the lawyers to determine when would be the best date for all parties for a minimum five-day trial. The Court proposed three dates: May 1, 2017, May 30, 2017, and June 12, 2017. The Court further advised that May 1, 2017, was the Court's first choice and preferred date, but that the other dates were available on the Court's calendar as well for a week-long trial. In response, the Court was advised that because the Defendant's attorney was out of town [from April 1, 2017] until April 24, 2017, he would prefer the May 30, 2017, trial date. The State

13

agreed. The Court then set the trial on the date agreed to by the parties, May 30, 2017.

**{¶38}** In light of the foregoing, and the total of 61 days, the trial court found the length of the delay as well as the reasons for the delay were not unreasonable. We discern no error in this conclusion.

**{¶39}** Regarding the third *Barker* factor, appellant never directly asserted his right to a speedy trial. It was only by virtue of the trial court electing to treat his motion for discharge as a withdrawal of his unlimited waiver and a demand for trial that the issue arose.

**{¶40}** Finally, appellant does not argue his defense was somehow prejudiced by the delay at issue. He argues that, even if the filing of his motion to suppress evidence was a tolling event, the court's 26-month delay in ruling on the same was unreasonable. Preliminarily, appellant does not acknowledge that, while the motion was pending, he had previously waived his speedy trial rights. Appellant's argument is, in effect, merely a red herring. Because appellant fails to advance any argument regarding how any delay prejudiced his defense, we hold the trial court did not err in concluding appellant suffered no prejudice by the trial date being set 61 days after his constructive withdrawal of the waiver. In light of the foregoing, we conclude the trial court did not err in finding no speedy trial violation.

**{¶41}** Appellant's second assignment of error lacks merit.

**{¶42}** For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is affirmed.

DIANE V. GRENDELL, J., concurs,

COLLEEN MARY O'TOOLE, J., concurs in judgment only.

14