[Cite as *State v. Baker*, 2014-Ohio-2873.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellant/<br>Cross-Appellee, | : | |
| | : | **CASE NO. 2013-A-0020** |
| - vs - | : | |
| | : | |
| MICHAEL D. BAKER, | : | |
| Defendant-Appellee,<br>Cross-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court, Eastern Division.
Case No. 2011 TRC 845.

Judgment: Affirmed.

*Nicholas A. Iarocci*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092 (For Plaintiff-Appellant/Cross-Appellee).

*William P. Bobulsky*, William P. Bobulsky Co., L.P.A., 1612 East Prospect Road, Ashtabula, OH 44004 (For Defendant-Appellee/Cross-Appellant).

TIMOTHY P. CANNON, P.J.

{¶1} Pursuant to Crim.R. 12(K), appellant/cross-appellee, the state of Ohio, appeals the judgment of the Ashtabula County Court, Eastern Division, granting the motion to suppress the results of appellee/cross-appellant, Michael D. Baker's, blood test results. Baker has filed a cross-appeal. Based on the following, we affirm.

{¶2} On March 6, 2011, a dark and rainy night, Trooper Charles Emery of the Ohio State Highway Patrol was working the midnight shift. Dispatch received calls that a pedestrian was walking eastbound in the westbound lane of U.S. 6 in Andover Township. A subsequent call was received that the pedestrian had been struck by an automobile resulting in the pedestrian's death.

{¶3} Trooper Emery arrived at the scene of the incident and identified the driver of the automobile as Baker. Baker was instructed to sit in the front of Trooper Emery's police car and complete an OH-3 Crash Statement Form. Baker complied. Trooper Emery continued his investigation of the scene.

{¶4} Trooper Emery testified that upon returning to his vehicle, he detected a "strong odor of alcohol." When asked if he had anything to drink, Baker advised Trooper Emery that he was coming from a party where he had consumed approximately 6-7 beers. Trooper Emery performed the HGN test and observed four clues of impairment. Baker then took a portable breath test. After that, Trooper Emery Mirandized Baker. Baker requested legal counsel.

{¶5} Trooper Emery then testified that it was standard procedure to draw blood from anyone involved in a fatal crash. Baker consented to the blood draw. Trooper Emery subsequently advised Baker of this procedure and also read to him the implied consent form, Bureau of Motor Vehicles Form 2255. BMV Form 2255 notified Baker that he was under arrest and of the consequences of refusing to take the blood alcohol content ("BAC") test, i.e., that he would lose his license if he did not comply with the officer's request for blood testing. Thereafter, Baker again consented to the blood draw.

2

Baker was transported to Saint Joseph's Hospital where Trooper Emery was able to conduct additional field sobriety tests.

{¶6} After completion of the field sobriety tests, Trooper Emery escorted Baker into the emergency room where his blood was drawn at 1:50 a.m. Trooper Emery mailed the vials at approximately 6:00 a.m. The vials were not refrigerated during this period of time. Baker's blood test result was 0.095 grams of alcohol per one hundred milliliters.

{¶7} On June 22, 2011, a traffic complaint was filed charging Baker with one count of operating a motor vehicle under the influence, in violation of R.C. 4511.19(A)(1)(b). Baker pled not guilty. Baker filed a motion to suppress, and a hearing was held. The trial court suppressed the results of Baker's blood test, stating:

> As to the failure to refrigerate the sample, however, the court finds that this is not a *de minimus* shortcoming. It is clear that the sample was not refrigerated prior to sending same to the lab. What is more, this is a matter of policy, not an isolated instance. The regulations require refrigeration. Further, as defendant has pointed out, there are simply too many other areas and items which the State, in its duty to go forward with the evidence, failed to adduce.

{¶8} The state filed a timely notice of appeal, and Baker filed a notice of cross-appeal. The state assigns the following assignment of error for our consideration:

{¶9} "The trial court erred in granting appellee's motion to suppress."

{¶10} On appeal, the state asserts the trial court erred in granting Baker's motion to suppress, thereby excluding Baker's blood sample. The state maintains it substantially complied with the Ohio Administrative Code regulations and committed no violation that would affect the reliability of Baker's blood sample.

3

**{¶11}** At the outset, we note that our review of a decision on a motion to suppress involves issues of both law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. During a suppression hearing, the trial court acts as trier of fact and sits in the best position to weigh the evidence and evaluate the credibility of the witnesses. *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Accordingly, an appellate court is required to uphold the trial court's findings of fact provided they are supported by competent, credible evidence. *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). Once an appellate court accepts the trial court's factual findings, the court must then engage in a de novo review of the trial court's application of the law to those facts. *State v. Lett*, 11th Dist. Trumbull No. 2008-T-0116, 2009-Ohio-2796, ¶13, citing *State v. Djisheff*, 11th Dist. Trumbull No. 2005-T-0001, 2006-Ohio-6201, ¶19.

> In any prosecution premised upon a violation of R.C. 4511.19, the result of a blood alcohol test is presumed valid unless the defendant first challenges the validity 'by way of a pretrial motion to suppress.' *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶24. Failure to file such a motion 'waives the requirement on the state to lay a foundation for the admissibility of the test results.' *Id.*, quoting *State v. French,* 72 Ohio St.3d 446, 451. However, if the defendant challenges the validity of the test results by means of a pretrial suppression motion, the burden shifts to the state 'to show that the test was administered in substantial compliance with the regulations prescribed by the Director of Health.' *Id.* If the state satisfies this burden and creates a presumption of admissibility, 'the burden then shifts to the defendant to rebut that presumption by demonstrating that he was prejudiced by anything less than strict compliance.' *Id.*, citing *State v. Brown* (1996), 109 Ohio App.3d 629, 632, 672 N.E.2d 1050.

*State v. Price*, 11th Dist. Geauga No. 2007-G-2785, 2008-Ohio-1134, ¶18.

**{¶12}** In his motion to suppress and at the hearing, Baker argued the state failed to comply with Ohio Adm. Code 3701-53-05, the requirement that blood samples be refrigerated when not in transit or under examination.

4

{¶13} Testimony at the suppression hearing revealed that Baker's blood was extracted at 1:53 a.m., and Trooper Emery mailed Baker's blood sample to the lab at 6:00 a.m. Trooper Emery did not refrigerate Baker's blood after withdrawal, and therefore, the blood sample remained unrefrigerated for approximately four hours and ten minutes. The trial court found this period of non-refrigeration was "not a *de minimus* shortcoming."

{¶14} Because Baker challenged the validity of the test results by means of a pretrial motion, the burden shifted to the state to establish the admissibility of the evidence either by showing the test was administered in substantial compliance with the regulations prescribed by the Director of Health or by establishing the reliability of the results through expert testimony. The concept that is necessary to understand is that if the test was administered in substantial compliance with the regulations, no expert testimony is required to establish reliability. If, on the other hand, the test was *not* administered in substantial compliance, the reliability of the results must be established by expert testimony.

{¶15} The state cites this court's opinion in *Price*, *supra*, to support its position that failure to refrigerate a blood sample for four hours falls within the range of substantial compliance. In *Price*, the state failed to refrigerate the appellant's blood sample for approximately six hours. We stated in *Price* that the lack of refrigeration for a six-hour period raised concerns. *Id.* at ¶26. However, we noted that "'the issue is the reliability of the test results not the performance requirements of the Ohio Administrative Code.'" *Id.*, quoting *State v. Brush,* 5th Dist. Licking No. 04CA92, 2005-Ohio-3767, ¶24. We then recognized that the testimony at the suppression hearing in *Price* established

5

that, "due to the presence of the preservative in the blood sample, the lack of refrigeration would not affect the reliability of the test results, even if bacteria were present in the blood." *Id.*

{¶16} The instant case is readily distinguishable from *Price.* Here, there was evidence that the blood sample was unrefrigerated prior to transit, in contravention to Ohio Adm. Code 3701-53-05(F). When there is compliance with the Department of Health regulations, the state does not have to establish a foundation for admissibility of the blood test result. As a result of the state's noncompliance, however, it was required to establish a proper foundation for the admissibility of the result. Therefore, the state was required to put forth evidence at the suppression hearing that the lack of compliance with Ohio Adm. Code 3701-53-05(F) did not affect the reliability of the blood test results. Unlike *Price,* there was no testimony in this case that the lack of refrigeration failed to affect the reliability of Baker's blood test result. To the contrary, Emily Adelman, an employee at the Ohio State Highway Patrol Crime Lab in the Toxicology Unit, testified it is required that the blood draw kits be refrigerated—the only time they are not to be refrigerated is when they are being tested or in transit. The state did not introduce any testimony to demonstrate how the failure to refrigerate the sample as required would or would not affect the reliability of the test results.

{¶17} The concurring opinion suggests it would apply the holding in *State v. Burnside, supra.* A careful reading of *Burnside* establishes it is in harmony with the holding in both this case and *Price.* The *Burnside* Court made clear that, in the absence of any evidence to the contrary, the court should not substitute its opinion for that of the Director of Health.

6

> This problem is particularly acute where, as here, the state has failed to proffer evidence that it complied with a particular regulation directly related to blood-alcohol testing. To state it succinctly: A court infringes upon the authority of the Director of Health when it holds that the state need not do that which the director has required. Such an infringement places the court in the position of the Director of Health for the precise purpose of second-guessing whether the regulation with which the state has not complied is necessary to ensure the reliability of the alcohol-test results. This approach further precipitates conflicting decisions from lower courts and impedes the public policy of achieving uniformity and stability in the law.

*Id.* at ¶33.

{¶18} While this opinion is completely consistent with the holding in *Burnside,* the concurring opinion suggests that lack of compliance somehow renders the evidence completely inadmissible. That is simply not the case. Compliance with the regulations established by the Director of Health creates a foundation for admissibility without the need for an expert witness. Lack of compliance does not relegate the evidence inadmissible; it simply eliminates the state's ability to have evidence admitted without the necessary foundation. The state loses the presumption of admissibility when there is a lack of compliance, and expert testimony becomes necessary to establish reliability. The concurring opinion suggests that expert testimony is somehow not welcome in these cases. If reliability is established by expert testimony, however, there is no basis upon which to exclude it. In fact, when a proper foundation has been established, expert testimony regarding a defendant's intoxication has been admitted, even in the absence of a blood alcohol test. *State v. Knapp*, 11th Dist. Ashtabula No. 2011-A-0064, 2012-Ohio-2354, ¶102.

{¶19} The dissent suggests this opinion is not consistent with our decision in *Price.* The *Price* opinion notes:

7

> With regard to the second issue of non-refrigeration, we note that while non-refrigeration for the six hour period of time between when the sample was taken from Price and the time it was actually mailed does raise some concerns, the Fifth Appellate District has noted, 'the issue is the reliability of the test results not the performance requirements of the Ohio Administrative Code.' *State v. Brush,* 5th Dist. No. 04CA92, 2005-Ohio-3767, at ¶24 (citation omitted). [The Senior Forensic Chemist for the Lake County Crime Lab] testimony indicated that, due to the presence of the preservative in the blood sample, *the lack of refrigeration would not affect the reliability of the test results*, even if bacteria were present in the blood.

*Price*, *supra*, ¶26 (emphasis added).

{¶20} In this case, there was no expert testimony that the presence of the anticoagulant renders a sample reliable, despite the lack of refrigeration. The dissent, however, cites to the testimony of the Ohio State Highway Patrol technician, Emily Adelman, who stated the grey-topped vials contained an anticoagulant powder. However, there was no attempt to qualify her as an expert capable of testifying to the chemical effect of this powder.

{¶21} In order to arrive at its conclusion, the dissent cites to expert testimony in the trial record from *Price* to establish the reliability of the sample in this matter. The dissent suggests the expert testimony from *Price* can be imputed to the record in this case. Yet, there is no provision in the rules or laws of the state of Ohio that permits the Ashtabula Municipal Court judge to consider expert testimony given in the Portage County Municipal Court, in a different case, to a different judge. The technician's testimony fails to establish the reliability of the test result *in this case*. Because there was no evidence in our record establishing the test was reliable, our resolution of this matter is inherently consistent with *Price*. The dissent asserts that "[w]hether there was substantial compliance or not, placing the burden on the State to demonstrate reliability

8

is a misapplication of the law. *Burnside*, ¶32-33." This is not the proposition of law in *Burnside* at ¶32-33. If the state has not substantially complied and seeks to have the result admitted, the burden is most definitely on the state to prove the reliability of such result.

{¶22} The dissent further suggests that because there was evidence of a period of days when the sample was in the mail, the refrigeration requirement should be ignored; however, that is exactly what a unanimous Ohio Supreme Court indicated we should not do in *Burnside*. *Id*. at ¶32-37. The Director of Health imposed that requirement for some reason, and judges should not substitute their own scientific assessment for that of the Director. This, in fact, is the key concept stated in *Burnside* at ¶32-33.

{¶23} Based on the foregoing, the state's assignment of error is without merit.

{¶24} On cross-appeal, Baker assigns the following assignments of error for our review:

> [1.] The trial court erred in failing to grant Appellee's Motion to Suppress evidence based upon the absence of probable cause to detain Appellee.
>
> [2.] The trial court erred in failing to grant Appellee's Motion to Suppress evidence based upon the undertaking of field sobriety tests and blood tests of Appellee without probable cause.
>
> [3.] The trial court erred in failing to grant Appellee's Motion to Suppress evidence by admitting and considering evidence of field sobriety tests without establishing applicable standardized testing procedures.
>
> [4.] The trial court erred in failing to grant Appellee's Motion to Suppress evidence by considering and admitting evidence and results of the testing of appellee's blood.

9

[5.] The trial court erred in failing to grant Appellee's Motion to Suppress evidence obtained by the State following Appellee's specific request to terminate questioning and speak to an attorney.

{¶25} Based on our disposition of the state's assignment of error, Baker's assignments of error are moot.

{¶26} Based on the opinion of this court, the judgment of the Ashtabula County Court, Eastern Division, is hereby affirmed.

COLLEEN MARY O'TOOLE, J., concurs in judgment only with a Concurring Opinion,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., concurs in judgment only with a Concurring Opinion.

{¶27} I concur with the result reached in this case, but write separately, as I believe the analysis approved by this court in *Price*, *supra*, is fundamentally flawed. The writing judge approves *Price*, and distinguishes it. I would overrule that case.

{¶28} The purpose of a motion to suppress is to protect the rights of a defendant by eliminating from trial evidence secured illegally, generally in violation of a constitutional right. *State v. Pizzino*, 11th Dist. Portage Nos. 2012-P-0079 and 2012-P-0080, 2013-Ohio-545, ¶10. In this case, Mr. Baker consented to the blood draw, so any issue regarding how that evidence was obtained is waived. The question before us is whether the test results of the blood sample obtained are admissible to prove Mr. Baker's guilt, due to the failure by the authorities to comply with the Ohio Administrative

10

Code, and the Director of Health's requirements for the transportation and storage of blood samples.

{¶29} Ohio Adm.Code 3701-53-05(F) provides: "While not in transit or under examination, all blood and urine specimens shall be refrigerated." The language is mandatory. Recognizing the difficulties in requiring the authorities to meet such stringent requirements, the Supreme Court of Ohio approved "substantial compliance" with regulations regarding alcohol testing, so long as a defendant does not show prejudice. *State v. Plummer*, 22 Ohio St.3d 292, syllabus (1986). In *Plummer*, the urine sample in question might have been unrefrigerated for approximately three hours and 25 minutes to five hours and 25 minutes. *Id.* at 294-295.

{¶30} In 2003, the Supreme Court revisited the substantial compliance issue, in *Burnside, supra*. Speaking through late Chief Justice Moyer, the court stated:

{¶31} "Although we have not had occasion to expound upon the substantial-compliance standard, appellate courts have developed two approaches to determine whether the state has substantially complied with Ohio Adm.Code 3701-53-05. One approach is to consider whether the noncompliance rendered the test results unreliable. See, e.g., *State v. Gray* (1980), 4 Ohio App.3d 47, 50, 51, * * *. Under this approach, a court will conclude that the state has substantially complied with the Department of Health regulations if the alleged deviation did not affect the reliability of the test results. Id. The other approach for determining substantial compliance is to consider whether the alleged deviation prejudiced the defendant. See, e.g., *State v. Zuzaga* (2001), 141 Ohio App. 3d 696, 701, * * *. Under this approach, a court will conclude that the state

11

has substantially complied with the Department of Health regulations so long as the alleged deviation did not cause an erroneously higher test result. Id.

{¶32} "The import in denominating between these two approaches lies not in understanding the difference between them, but rather in recognizing the similarity: both require a judicial determination of what effect, if any, noncompliance had on the alcohol-test results. This determination, however, often requires judges to speculate why the Director of Health adopted a given regulation. One judge, charged with determining whether the failure to strictly comply with a regulation rendered alcohol-test results unreliable, deplored the fact that 'most judges, myself included, do not know enough about chemistry, physics, or scientific testing so as to be able to know why the Department of Health adopted some of the required procedures.

{¶33} "'(* * *)

{¶34} "'(* * *) Thus, since I cannot know whether there was substantial compliance in this case, I am left with having to guess.' *State v. Mitchell* (Mar. 31, 1995), 6th Dist. No. L-92-227, 1995 Ohio App. LEXIS 1225, * * *(Grey, J., dissenting).

{¶35} "This sentiment is not surprising when one considers the more fundamental problem with such a method of determining admissibility: a judicial determination that an alcohol test, although not administered in strict compliance with the alcohol-testing regulations, is reliable and therefore admissible may subvert the rule-making authority and the statutory mandate of the Director of Health. Indeed, the General Assembly instructed the Director of Health--and *not* the judiciary--to ensure the reliability of alcohol-test results by promulgating regulations precisely because the former possesses the scientific expertise that the latter does not. See R.C.

12

4511.19(D)(1). Notwithstanding this statutory mandate, however, courts have concluded that the state need not show strict compliance with the regulations prescribed by the Director of Health if a *judge* deems the test results reliable. The problem, of course, is that such an approach is inconsistent with R.C. 4511.19, which provides that *compliance with the regulations*, rather than a judicial determination as to reliability, is the criterion for admissibility. See *Cincinnati v. Sand* (1975), 43 Ohio St.2d 79, * * *.

{¶36} "This problem is particularly acute where, as here, the state has failed to proffer evidence that it complied with a particular regulation directly related to blood-alcohol testing. To state it succinctly: A court infringes upon the authority of the Director of Health when it holds that the state need not do that which the director has required. Such an infringement places the court in the position of the Director of Health for the precise purpose of second-guessing whether the regulation with which the state has not complied is necessary to ensure the reliability of the alcohol-test results. This approach further precipitates conflicting decisions from lower courts and impedes the public policy of achieving uniformity and stability in the law. Painter, Ohio Driving Under the Influence Law (2003), Section 9.3, 116.

{¶37} "Nevertheless, we are cognizant that if 'we were to agree (* * *) that any deviation whatsoever from the regulation rendered the results of a (test) inadmissible, we would be ignoring the fact that strict compliance is not always realistically or humanly possible.' *Plummer*, 22 Ohio St.3d at 294, * * *. Precisely for this reason, we concluded in *Steele* that rigid compliance with the Department of Health regulations is not necessary for test results to be admissible. [*State v.*] *Steele*, 52 Ohio St.2d[187] at 187, * * *[(1977)] (holding that the failure to observe a driver for a 'few seconds' during

the 20-minute observation period did not render the test results inadmissible).  To avoid usurping a function that the General Assembly has assigned to the Director of Health, however, we must limit the substantial-compliance standard set forth in *Plummer* to excusing only errors that are clearly de minimis.  Consistent with this limitation, we have characterized those errors that are excusable under the substantial-compliance standard as 'minor procedural deviations.'  *State v. Homan* (2000), 89 Ohio St.3d 421, 426, * * *."  (Emphasis sic.)  (Parallel citations omitted.)  *Burnside*, *supra*, at ¶28-34.

{¶38}  In sum, *Burnside* mandates that, in order to avoid the judiciary usurping the statutory authority of the Director of Health, only "de minimis," or "minor procedural deviations" from Ohio Adm.Code 3701-53-05 meet the substantial compliance test.  And yet, the courts of appeals have approved ever-increasing periods of time during which blood and urine samples may go unrefrigerated as "substantial compliance."  *See, e.g., State v. Schneider*, 1st Dist. Hamilton No. C-120786, 2013-Ohio-4789, ¶22 (Hendon, P.J., dissenting).  In *Schneider*, the First District found that leaving a urine sample unrefrigerated for almost 19 hours was in substantial compliance with Ohio Adm.Code 3701-53-05.  *Id.*

{¶39}  I respectfully disagree that the issue in this case is whether the state bears the burden of proving test results *reliable*.  As the writing judge correctly notes, the results are presumed reliable unless a motion to suppress is filed.  Since a motion to suppress was filed, the burden shifted to the state to prove substantial compliance with the Director of Health's regulations.  I respectfully disagree that substantial compliance may be proven by expert testimony showing the results were reliable, in fact.  The state's burden relates to the regulations, not the results.  This is what *Burnside* requires:

14

that the state proffer "evidence that it *complied with a particular regulation.*" (Emphasis added.) *Burnside* at ¶33. If the state can do so, the burden shifts back to the defendant to show prejudice due to lack of strict compliance.

{¶40} I respectfully contend that the procedure approved by this court in *Price*, *supra*, which the majority finds viable, conflicts with the standard set forth in *Burnside*. Effectively, the state is allowed to make *substantial* deviations from the requirement set forth at Ohio Adm.Code 3701-53-05 – that blood and urine samples "shall" be refrigerated "[w]hile not in transit or under examination" – by putting in evidence expert testimony that these substantial deviations have not affected the validity of any test results. At that point, the defendant must then show, by expert testimony, that the results are unreliable. In effect, this transfers to the courts the Director of Health's authority to issue regulations on the subject, which the Supreme Court of Ohio forbids.

{¶41} Further, we are all aware the Rules of Evidence generally do not apply at suppression hearings: the trial court may rely on hearsay, and any credible evidence, all of which may be excluded from trial. *See, e.g.*, *State v. Ladigo*, 7th Dist. Mahoning No. 05 MA 201, 2006-Ohio-3475, ¶21-24. But the effect of the procedure adopted by the writing judge in this case, and based on that approved in *Price*, *supra*, is to create a battle of experts – in a setting where the rules applicable to expert testimony, such as Evid.R. 702, *do not apply*. This raises a myriad of questions. How does a trial court judge between the credibility of the battling experts, without Evid.R. 702 as guidance? If a motion to suppress is either denied or granted, and the losing party chooses to appeal, what standards can, or should, be employed by the courts of appeals on review? If a motion to suppress is denied, and the matter nevertheless continues to

15

trial, would the trial court's judgment on the battle of the experts occurring at the suppression hearing have precedential value at trial? Apart from these legal questions, there is the question of expense, and judicial economy. Under the procedure approved in this case, both the state and the defendant must be prepared to fund *two* appearances by their respective expert witnesses.

{¶42} I respectfully believe the best procedure would be to apply the holding in *Burnside*, and find that substantial compliance with Ohio Adm.Code 3701-53-05, and similar regulations issued by the Director of Health, only occurs when any deviations from the procedures prescribed are de minimis.[1] In this case, I fully agree with the learned trial judge that the violation was not de minimis, and that the results of the tests on the blood sample required suppression.

{¶43} I concur in judgment only.

—————————————

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

{¶44} In affirming the trial court's suppression of the results of Baker's blood test, the majority not only disregards this court's own precedent in *State v. Price*, 11th

---

1. In *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, a decision post-dating *Burnside*, the court again referred to periods of non-refrigeration of a blood or urine sample of up to five hours as being in substantial compliance with the regulation. *Mayl* at ¶50, fn. 2. It did so relying on the even earlier decision in *Plummer*, *supra*. *Id.* I respectfully disagree with the dissent, and other courts, which conclude that this reference means substantial compliance with the regulation occurs despite such extended periods of non-refrigeration, when the sample is not being tested or transported. *See, e.g.*, *State v. Hutson*, 1st Dist. Hamilton Nos. C-060274, C-060275, and C-060276, 2007-Ohio-1178, ¶14. The reference to *Plummer* in *Mayl* is not essential to the decision in the latter case, which was decided on other grounds. Further, it seems to run counter to the decision in *Burnside*, which specifically clarified *Plummer*, and held that "substantial compliance" with the Director of Health's regulations only occurs when a violation of them is de minimis. I agree with the learned trial judge in this case that the extended period of non-refrigeration which occurred is simply not a de minimis infringement of the applicable regulation.

16

Dist. Geauga No. 2007-G-2785, 2008-Ohio-1134, but distorts the settled law regarding the admissibility of such tests. Accordingly, I respectfully dissent.

{¶45} "In determining the admissibility of alcohol-test results regulated by Ohio Adm.Code 3701-53-05, * * * [t]he state must * * * establish that it substantially complied with the alcohol-testing regulations to trigger the presumption of admissibility." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 27. The Supreme Court has advised that the substantial compliance standard should be applied "to excus[e] only errors that are clearly de minimis." *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, ¶ 49. For example, the court recognized that the "[f]ailure to refrigerate a sample for as much as five hours has been determined to substantially comply with Ohio Adm.Code 3701-53-05(F)." *Id.* at ¶ 50, fn. 2.

{¶46} In *Price*, this court held that there was substantial compliance with Ohio Administrative Code 3701-53-05(F)[2] where a police officer retained a blood specimen in an unrefrigerated state for six hours before mailing the specimen. *Price* at ¶ 26. Our decision is wholly consistent with the decisions of other appellate districts. *See State v. Neale*, 5th Dist. Licking No. 2011 CA 00090, 2012-Ohio-2530, ¶¶ 33-36 (specimen unrefrigerated for four and a half hours prior to mailing); *State v. Schneider*, 1st Dist. Hamilton No. C-120786, 2013-Ohio-4789, ¶ 7, 18-19 (specimen unrefrigerated for nineteen hours prior to mailing).

{¶47} In the present case, Baker's blood specimen was unrefrigerated for a little over four hours, yet the majority eschews this court's precedent in *Price* and holds that the State failed to establish a proper foundation for the admissibility of the test results.

---

2. Ohio Adm.Code 3701-53-05(F): "While not in transit or under examination, all blood and urine specimens shall be refrigerated."

17

The majority insists that *Price* stands for the proposition that, when the State fails to comply with the Administrative Code, it is "required to establish a proper foundation for the admissibility of the [test] result." *Supra* at ¶ 18. Thus, the majority implies that, in *Price*, this court found a violation of the Administrative Code. On the contrary, this court held "that Trooper Smith's retention of the blood specimen in an unrefrigerated state for six hours before mailing was [not] a violation," recognizing "'the fact that strict compliance is not always realistically or humanly possible.'" *Price*, 2008-Ohio-1134, at ¶ 26, quoting *Burnside* at ¶ 34.

**{¶48}** The majority's application of the *Price* case is both legally and factually incorrect.

**{¶49}** Factually, the majority would distinguish *Price* on the grounds that, in the present case, "there was no testimony * * * that the lack of refrigeration failed to affect the reliability of Baker's blood test result." *Supra* at ¶ 18. In *Price*, we recognized that, "[w]ith regard to the question of whether an anticoagulant or chemical preservative was present in the vacuum tube containing Price's blood sample, [there was] * * * testimony * * * that the tube containing Price's sample had a grey cap, which indicates the tube in question contained both potassium oxalate, an anticoagulant, and sodium fluoride, a preservative." *Price* at ¶ 25.

**{¶50}** In the present case, Trooper Charles Emery testified that he provided the paramedic at St. Joseph Health Center (Eric. R. Fabian) with two "clear glass vials with grey tops" to collect a blood sample. Fabian testified that he collected the blood samples with a "sterile" 23-guage butterfly needle into the vials with grey caps. Emily Adelman, a technician with the Ohio State Highway Patrol's crime laboratory, testified

18

that the grey tops signify that the vials "contain our anticoagulant powder in them before they have the blood * * * put into them." As in *Price*, there was full compliance with the requirement that the "[b]lood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant." Ohio Adm.Code 3701-53-05(C).

{¶51} Contrary to the majority's position, this case is not readily distinguishable from *Price*. This conclusion is a legal conclusion and does not, as the majority incorrectly states, require us to "impute" the expert testimony from the *Price* case. Rather, a comparison of the State's testimony from the *Price* case with the testimony in the present case demonstrates substantial compliance in both cases. In *Price*, the specimen went unrefrigerated for six hours before mailing. In the present case, the specimen went unrefrigerated for a little over four hours. The majority justifies its disparate conclusion in the present case by asserting "there was no evidence * * * establishing the test was reliable," and thus concluding that the result in the present case is consistent with *Price*. *Supra* at ¶ 23.

{¶52} As is more fully discussed below, compliance, not reliability, is the determinative issue. The evidence in the present case establishes substantial compliance with the administrative regulations without imputing any testimony from the *Price* case.

{¶53} The majority opinion also distorts the legal process for analyzing compliance with the Administrative Code. The majority correctly states the law in this regard: "[T]he result of a blood alcohol test is presumed valid * * *. However, if the defendant challenges the validity of the test results * * *, the burden shifts to the state 'to show that the test was administered in substantial compliance with the regulations

19

prescribed by the Director of Health.' * * *  If the state satisfies this burden * * *, 'the burden then shifts to the defendant * * * [of] demonstrating that he was prejudiced by anything less than strict compliance.'" (Citations omitted.) *Supra* at ¶ 13.

{¶54} Applying the law stated to the present situation, the first issue is whether there was substantial compliance with the Code. As demonstrated above, a delay of four hours, under this court's and other courts' precedents, constitutes substantial compliance. Here, the analysis should end and the evidence of Baker's blood test be deemed admissible.

{¶55} The majority fails to make any determination as to whether the four hour delay was substantial. Instead, the majority writes that "the state's noncompliance * * * required [it] to put forth evidence at the suppression hearing that the lack of compliance with OAC 3701-53-05(F) did not affect the reliability of the blood test results." *Supra* at ¶ 18. This analysis distorts the law as stated by the majority. If the four hour delay is less than substantial compliance, the results must be deemed inadmissible. There is no precedent for the State remedying a failure to substantially comply by "establish[ing] a proper foundation * * * that the lack of compliance * * * did not affect the reliability of the * * * results." If there was substantial compliance, then the burden was with Baker to demonstrate prejudice. Whether there was substantial compliance or not, placing the burden on the State to demonstrate reliability is a misapplication of the law.

{¶56} Again, the majority asserts that it is "necessary to understand" that, if "the test was *not* administered in substantial compliance, the reliability of the results must be established by expert testimony." *Supra* at ¶ 16. Ohio law, however, does not allow for

20

the State to cure a defect in substantial compliance through expert testimony on reliability.

**{¶57}** In *Burnside*, the Ohio Supreme Court recognized that there were two approaches for applying the substantial-compliance standard. The one approach considers "whether the noncompliance rendered the test results unreliable." 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 28. "Under this approach, a court will conclude that the state has substantially complied with the Department of Health regulations if the alleged deviation did not affect the reliability of the test results." *Id.* This is recognizably the approach adopted by the majority. The other approach considers "whether the alleged deviation prejudiced the defendant." *Id.*

**{¶58}** The Ohio Supreme Court rejected the approach that requires the courts to adjudicate the reliability of test results: "a judicial determination that an alcohol test, although not administered in strict compliance with the alcohol-testing regulations, is reliable and therefore admissible may subvert the rule-making authority and the statutory mandate of the Director of Health." *Id.* at ¶ 32. Not only does the majority's approach place "the court in the position of the Director of Health for the precise purpose of second-guessing whether the regulation with which the state has not complied is necessary to ensure the reliability of the alcohol-test results," but it "further precipitates conflicting decisions from lower courts and impedes the public policy of achieving uniformity and stability in the law." *Id.* at ¶ 33.

**{¶59}** A careful reading of the Ohio Supreme Court's decision in *Burnside* undermines the majority's position that "[t]he state loses the presumption of admissibility

21

when there is a lack of compliance, and expert testimony becomes necessary to establish reliability." *Supra* at ¶ 20. The two positions cannot be reconciled.

**{¶60}** Finally, the majority's preoccupation with the four hour delay overlooks the fact that the blood sample was unrefrigerated for a period of ten days while it was "in transit." Compared to the ten day period during which the sample was in transit, a delay of four hours is hardly substantial. *Schneider*, 2013-Ohio-4789, at ¶ 18 ("it is undisputed that a specimen is generally not refrigerated while in the mail; thus, the delay in mailing Schneider's specimen was inconsequential"). This does not suggest that the refrigeration requirement should be ignored; as emphasized above, the determinative issue is compliance with the Administrative Code. Rather, when considering whether there was substantial compliance with the Code, the relative amounts of time that the sample remains unrefrigerated prior to and during transit is a relevant consideration.

**{¶61}** For the foregoing reasons, I respectfully dissent and would reverse the decision of the court below.