[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Baker,* Slip Opinion No. 2016-Ohio-451.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-451

THE STATE OF OHIO, APPELLANT, *v.* BAKER, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Baker,* Slip Opinion No. 2016-Ohio-451.]

*Motor vehicles—Driving while intoxicated—Admissibility of blood-alcohol test results—State substantially complied with Ohio Adm.Code 3701-53-05's requirement that blood be refrigerated—Burden shifts to defendant to demonstrate prejudice from lack of strict compliance with administrative code.*

(No. 2014-1295—Submitted October 14, 2015—Decided February 10, 2016.)

APPEAL from the Court of Appeals for Ashtabula County,

No. 2013-A-0020, 2014-Ohio-2873.

_____

O'DONNELL, J.

{¶ 1} The state of Ohio appeals from a judgment of the Eleventh District Court of Appeals affirming the suppression of Michael Baker's blood-alcohol test results in connection with a charge of operating a motor vehicle under the influence

of alcohol. In a divided decision, the appellate court ruled that the state had failed to establish substantial compliance with Ohio Adm.Code 3701-53-05(F), which requires blood and urine specimens to be refrigerated when not in transit or under examination, and the test results were therefore inadmissible.

{¶ 2} Our review of the facts in this case reveals that Baker's blood sample was not refrigerated for a period of four hours and ten minutes before being placed in transit; however, we have previously held that the failure to refrigerate a sample for a period of up to five hours substantially complied with the administrative regulation. *See State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986), and *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 883 N.E.2d 1216.

{¶ 3} Accordingly, based on these facts and the applicable law, the state has established a presumption of admissibility with regard to the blood-alcohol test results, and we therefore reverse the judgment of the court of appeals; however, in conformity with *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, the case is remanded to the trial court with instructions to provide Baker with an opportunity to demonstrate prejudice consistent with the burden-shifting test we established in *Burnside*, as further clarified in this opinion.

**Facts and Procedural History**

{¶ 4} On March 6, 2011, Trooper Charles Emery of the Ohio State Highway Patrol responded to a call of a pedestrian walking eastbound in a westbound lane of U.S. Route 6 in Ashtabula County. While en route to the location, Emery learned that the pedestrian had been struck by a vehicle and died. He arrived at the scene around 12:30 a.m. and identified Baker as the driver of the vehicle that struck the decedent. He instructed Baker to sit in his cruiser and complete a crash statement form while he investigated the scene. Baker began to complete the form, but indicated that he wanted to speak with an attorney before filling out any paperwork.

{¶ 5} Upon returning to his cruiser, Emery detected a strong odor of alcohol, and he asked Baker whether he had had anything to drink. Baker told

Emery that he had had six or seven beers and had been coming from a party at a friend's house when the accident occurred. Emery administered a horizontal gaze nystagmus test and a portable breath test and also Mirandized Baker, but he did not arrest him. He then advised Baker he intended to take him to a hospital to have blood drawn, and Baker agreed to provide a blood sample without a search warrant.

{¶ 6} Emery drove Baker to St. Joseph's Hospital in Andover, administered the remaining portions of the field sobriety test, and escorted Baker to the emergency room, where Baker consented to having his blood drawn. At 1:50 a.m., a hospital paramedic drew Baker's blood, placed it in two tubes from a kit that Emery supplied, signed the labels in the kit, and handed the tubes to Emery, who affixed the labels to them and put them in a sealed box.

{¶ 7} Emery drove Baker home without issuing a citation, returned to the highway patrol post to finish paperwork, and kept the box with the blood sample in his cruiser. At 6:00 a.m., when his shift ended, he mailed the box to the Ohio State Highway Patrol Crime Laboratory in Columbus.

{¶ 8} A criminalist at the Columbus crime lab used the gas chromatography method to test the sample for alcohol. Testing of Baker's blood showed "0.095 grams by weight of alcohol per one hundred milliliters (grams percent) of whole blood."

{¶ 9} On June 21, 2011, the state filed a complaint in the Ashtabula County Court, alleging that Baker violated R.C. 4511.19(A)(1)(b), which prohibits a person from operating a vehicle within the state if the person has "a concentration of eight-hundredths of one per cent or more but less than seventeen-hundredths of one per cent by weight per unit volume of alcohol in the person's whole blood." That same day, an Ashtabula County Grand Jury indicted Baker, charging him with a violation of R.C. 4511.19(A)(1)(b), a misdemeanor of the first degree. On the state's motion, the case was transferred to the county court for prosecution on the state's complaint.

**{¶ 10}** Baker pleaded not guilty and moved to suppress the evidence obtained from him, including the laboratory and chemical tests of his alcohol level. After holding a hearing, the trial court granted Baker's motion as to the suppression of the blood-alcohol test results, stating: "As to the failure to refrigerate the sample, * * * the court finds that this is not a *de minimis* shortcoming."

**{¶ 11}** The state and Baker each appealed to the Eleventh District Court of Appeals, which affirmed suppression of the blood-alcohol evidence in a divided decision. Two judges on the panel agreed that the state had failed to establish substantial compliance with the requirement in Ohio Adm.Code 3701-53-05(F) that blood and urine specimens be refrigerated when not in transit or under examination, but they disagreed on the consequence of violating the regulation. One jurist opined that the failure to substantially comply rendered the blood-test result inadmissible, while the other concluded that it put the burden on the state to prove the reliability of the blood-test result before it could be admitted at the suppression hearing. The third judge on the panel dissented and would have held that the state established substantial compliance pursuant to *State v. Price*, 11th Dist. Geagua No. 2007-G-2785, 2008-Ohio-1134, ¶ 26, which had decided that a trooper's retention of a blood specimen in an unrefrigerated state for six hours did not violate Ohio Adm.Code 3701-53-05(F).

**{¶ 12}** We accepted the state's discretionary appeal to consider whether the state substantially complied with Ohio Adm.Code 3701-53-05(F) when it allowed a blood sample to remain unrefrigerated for four hours and ten minutes before placing it in the mail and whether, absent a showing of prejudice, the blood-alcohol test results are admissible. 141 Ohio St.3d 1421, 2014-Ohio-5567, 21 N.E.3d 1114.

### Arguments of the Parties

**{¶ 13}** The state asserts that according to this court's precedent, it substantially complied with Ohio Adm.Code 3701-53-05(F), noting that in *State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986), we determined that a urine

4

sample, which was not refrigerated for one hour and 25 minutes before mailing and for an additional three to four hours after arrival at the laboratory, substantially complied with the refrigeration requirements in the Ohio Administrative Code. The state further notes that in *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, ¶ 50, fn. 2, we recognized and applied *Plummer*'s holding that a sample unrefrigerated for as long as five hours substantially complied with Ohio Adm.Code 3701-53-05(F). It also contends that in *Price*, 2008-Ohio-1134, the court of appeals concluded that a lack of refrigeration for several hours between the collection of a sample and its placement in transit constituted substantial compliance with the administrative rule and that other Ohio appellate courts have reached similar conclusions. The state maintains that because Baker did not demonstrate prejudice from the lack of refrigeration of the sample before transit, the trial court erred in granting his motion to suppress.

{¶ 14} Baker, on the other hand, claims that the state did not comply with Ohio Adm.Code 3701-53-05(F), that Emery could have refrigerated the blood sample while he was at the highway patrol post but failed to do so because it was not the highway patrol's usual procedure, and he contends the highway patrol may not overrule or modify the requirements of the Ohio Administrative Code. He notes that the state did not offer any expert testimony at the suppression hearing to demonstrate that Emery substantially complied with the administrative rule or show that the failure to refrigerate the sample did not affect the reliability of the blood-alcohol test results.

{¶ 15} The larger question presented in this appeal is whether the failure to refrigerate a blood sample not in transit or under examination contrary to Ohio Adm.Code 3701-53-05(F) for a period of four hours and ten minutes is a de minimis error or whether it affects the reliability of a gas chromotography test on that sample such that it becomes an inaccurate measurement of alcohol in the blood and justifies suppression of that evidence.

**Law and Analysis**

{¶ 16} The legislature in Ohio has directed that in a criminal prosecution for a violation of R.C. 4511.19(A) or (B), a bodily substance shall be analyzed in accordance with methods approved by the director of health, R.C. 4511.19(D)(1)(b), and that the director of health "shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's whole blood," R.C. 3701.143. Pursuant to these directives, the director of health promulgated Ohio Adm.Code 3701-53-05.

{¶ 17} The regulation in question—Ohio Adm.Code 3701-53-05(F)—is patently clear about what is required when the state decides to obtain a blood or urine sample from persons in this state. It states, "While not in transit or under examination, all blood and urine specimens shall be refrigerated."

{¶ 18} Several cases involving compliance with the regulations promulgated by the director of health regarding bodily substances are instructive on the issue before the court. In *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 22, we noted that this court first addressed the application of Ohio Department of Health regulations governing alcohol testing in *State v. Steele*, 52 Ohio St.2d 187, 370 N.E.2d 740 (1977), and stated that *Steele* "established that rigid compliance with alcohol-testing procedures in the Ohio Administrative Code is not a prerequisite to the admissibility of alcohol-test results." *Id.* at ¶ 22. We also discussed *State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986)—a case in which we considered the consequences of the state's failure to refrigerate urine samples that were not in transit or under examination. We recognized that in *Plummer,* this court concluded that a three-to-four-hour interval without refrigeration did not render the test results inadmissible. *Burnside* at ¶ 23. We also acknowledged *Plummer*'s holding that " '[a]bsent a showing of prejudice to a defendant, the results of a urine-alcohol test administered in substantial compliance with Ohio Adm.Code 3701-53-05 are admissible in a

prosecution under R.C. 4511.19.' " *Id.*, quoting *Plummer* at the syllabus. Notably, in *Burnside*, we did not overrule *Plummer*, but we limited *Plummer*'s substantial-compliance standard to "excusing only errors that are clearly de minimis." *Burnside* at ¶ 34.

{¶ 19} After *Burnside*, we issued *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 883 N.E.2d 1216, in which we examined the admissibility of a hospital blood-alcohol test in an aggravated-vehicular-homicide prosecution. In that case, we concluded that "in a criminal prosecution for aggravated vehicular homicide that depends upon proof of an R.C. 4511.19(A) violation, laboratory test results are admissible only if the state shows substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm.Code Chapter 3701–53, even if the test was conducted in an accredited hospital laboratory." *Mayl* at ¶ 3. Although we ultimately determined that the hospital laboratory's lack of proper permits issued by the director of health and its disposal of the blood sample within a matter of days after testing were not minor procedural deviations from the regulation that could be excused, *Mayl* at ¶ 52, we nonetheless concluded that there had been substantial compliance with other Administrative Code requirements, including Ohio Adm.Code 3701–53–05(F). *Mayl* at ¶ 50. In support of that determination, we stated:

> Failure to refrigerate a sample for as much as five hours has been determined to substantially comply with Ohio Adm.Code 3701-53-05(F), which states that "[w]hile not in transit or under examination, all blood and urine specimens shall be refrigerated." *State v. Plummer* (1986), 22 Ohio St.3d 292, 294–295, 22 OBR 461, 490 N.E.2d 902.

*Mayl* at ¶ 50, fn.2.

**{¶ 20}** In this case, Emery's failure to refrigerate the blood sample for four hours and ten minutes is within the five-hour period of nonrefrigeration that our footnote in *Mayl* sanctioned as substantial compliance with Ohio Adm.Code 3701-53-05(F). And holding that the period of nonrefrigeration in this case substantially complies with the Ohio Administrative Code is consistent with our determination in *Plummer* that a three-to-four-hour interval when the specimen may not have been refrigerated also substantially complied with a former version of Ohio Adm.Code 3701-53-05(F) requiring refrigeration of specimens while not in transit or under examination. *Plummer* at 294-295.

**{¶ 21}** While strict compliance with the regulation is preferable, we recognize inherent logistical issues that may make strict compliance unrealistic. We therefore conclude that failing to refrigerate a blood specimen for a period of four hours and ten minutes before placing it in transit for analysis is a de minimis error and does not render the test result inadmissible for failure to substantially comply with Ohio Adm.Code 3701-53-05(F).

### Burden-Shifting Test

**{¶ 22}** When evaluating the admissibility of blood-alcohol test results, Ohio courts have applied the burden-shifting test we announced in *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 24. In light of continuing litigation and confusion about substantial compliance with regulations regarding the collection, handling, and testing of bodily substances, we clarify the *Burnside* burden-shifting test as follows:

**{¶ 23}** A defendant must first challenge the validity of the alcohol test by way of a pretrial motion to suppress evidence; failure to file such a motion "waives the requirement on the state to lay a foundation for the admissibility of the test results." *State v. French*, 72 Ohio St.3d 446, 451, 650 N.E.2d 887 (1995). The state then has the burden to show that it substantially complied with regulations prescribed by the director of health in the Ohio Administrative Code. If the state

meets its burden of going forward with the evidence in this regard, a presumption of admissibility arises, and the burden then shifts back to the defendant to rebut the presumption by demonstrating prejudice from the state's failure to strictly comply with the applicable regulations in the Ohio Administrative Code.

{¶ 24} In accordance with this procedure, we recognize that Baker initially filed a pretrial motion to suppress the results of his blood-alcohol test. That filing shifted the burden of going forward with evidence to the state to demonstrate that although it failed to refrigerate the specimen before placing it in transit, it nonetheless substantially complied with Ohio Adm.Code 3701-53-05(F). The state relied on *Plummer* and *Mayl* and argued that the failure to refrigerate the blood sample for four hours and ten minutes is a de minimis error. We recognize that the state's error in failing to refrigerate the blood sample in this case is de minimis and that it substantially complied with the regulation. The state's substantial compliance created a presumption of admissibility of the blood-alcohol test results, shifting the burden back to Baker to rebut that presumption by demonstrating prejudice from the lack of strict compliance with Ohio Adm.Code 3701-53-05(F). Because both the trial and appellate courts ruled in his favor on the substantial-compliance issue, Baker has not yet had an opportunity to demonstrate prejudice from the lack of strict compliance with the regulations. The proper forum for such a determination is the trial court. Accordingly, the judgment of the appellate court is reversed and the matter is remanded to the trial court with instructions to provide Baker an opportunity to go forward with evidence in this matter.

## Conclusion

{¶ 25} R.C. 4511.19(D)(1)(b) and 3701.143 authorize the director of health to promulgate regulations for analyzing bodily substances, and in conformity therewith, the director promulgated Ohio Adm.Code 3701-53-05(F).

{¶ 26} Our decisions in *Plummer* and *Mayl* are instructive on the question of substantial compliance with Ohio Adm.Code 3701-53-05(F) and establish that

the state's error in failing to refrigerate a specimen for four to five hours before placement of the specimen in transit to a laboratory for analysis is a de minimis error and does not render the test results inadmissible.

{¶ 27} In *Burnside,* we established a burden-shifting test, and we clarify that if the state demonstrates substantial compliance with the regulations for collecting, handling, and testing specimens, the court should afford the defendant an opportunity to go forward with evidence to rebut the presumption of admissibility by demonstrating that the failure to strictly comply may have caused an unreliable test result that does not properly measure alcohol content in the specimen. Here, the state demonstrated substantial compliance, but Baker has not been given the opportunity to rebut the presumption of admissibility. Accordingly, we remand the cause to the trial court to provide Baker with an opportunity to demonstrate prejudice and to conduct further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

PFEIFER, KENNEDY, and FRENCH, JJ., concur.

O'CONNOR, C.J., and LANZINGER, J., concur separately.

O'NEILL, J., dissents.

_____

**O'CONNOR, C.J., concurring.**

{¶ 28} The majority opinion restates our prior holdings on substantial compliance with regulations regarding the proper handling of bodily substances and the burden-shifting test used to govern the admissibility of blood-alcohol test results. There is, for all intents and purposes, a court-made rule that a failure to refrigerate a specimen for four to five hours is a de minimis error. Although the majority correctly states prior case law, I believe that this is an opportunity to focus on the shortcomings of Ohio Adm.Code 3701-53-05(F), the director of health's

regulation that gives rise to this court-made rule. I concur separately to caution against a blanket-rule approach and, as importantly, to express my concern over the limited usefulness of the current regulation in determining whether specific errors in handling specimens are de minimis.

{¶ 29} Ohio Adm.Code 3701-53-05(F) simply requires that "[w]hile not in transit or under examination, all blood and urine specimens shall be refrigerated." A substantial-compliance standard is used to determine whether the state complied with this regulation, but only de minimis errors or " 'minor procedural deviations' " are permitted. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 34, quoting *State v. Homan,* 89 Ohio St.3d 421, 426, 732 N.E.2d 952 (2000). The purpose of allowing only minor deviations from the regulations is "[t]o avoid usurping a function that the General Assembly has assigned to the Director of Health" in developing procedures "to ensure the reliability of alcohol-test results." *Id.* at ¶ 32, 34.

{¶ 30} The majority's conclusion that a specimen being unrefrigerated for four to five hours is a de minimis error is based on our decisions in *State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986), and *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216.[1] *Plummer* involved the testing of a urine sample that was collected in the month of August. *Id*. at 292. Prior to being mailed to the lab, the specimen was unrefrigerated for approximately one and a half hours; the court noted that during that time, the specimen was packaged, labeled, and delivered to the mail drop. *Id.* at 294. After transit, the specimen was unrefrigerated in the lab for at most three to four hours. *Id.* at 294-295.

{¶ 31} Here, the blood specimen was collected in March and was kept in the officer's car at an unknown temperature for approximately four hours before it was mailed to the lab. I concur in the majority opinion because it is not clear that

---

[1] *Mayl* did not analyze the pretransit-refrigeration issue but instead simply restated the *Plummer* holding in a footnote. *Mayl,* 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, ¶ 50, fn. 2.

the factual differences between the two cases matter given that the regulation does not provide guidance on what conditions are critical to ensuring reliability of the test results from a sample.

{¶ 32} Some appellate courts have concluded that the failure to refrigerate a sample for up to almost 19 hours constitutes a de minimis error and that the corresponding handling procedures are in substantial compliance with the regulation. *See, e.g., State v. Watson*, 9th Dist. Summit No. C.A.27257, 2015-Ohio-283, ¶ 22 (specimen was unrefrigerated for 63 minutes); *State v. Schneider*, 1st Dist. Hamilton No. C-120786, 2013-Ohio-4789, ¶ 7, 18, 19 (specimen was unrefrigerated for 18 hours and 45 minutes, but according to the court, the specimen was "in transit" within the meaning of the regulation when the trooper transported the sample to his patrol post and to the mailbox); *State v. Price*, 11th Dist. Geauga No. 2007-G-2785, 2008-Ohio-1134, ¶ 26 (specimen was unrefrigerated for six hours).   But other appellate districts have held that 12 or 17 hours without refrigeration was not a de minimis error.   *State v. Mullins*, 4th Dist. Ross No. 12CA3350, 2013-Ohio-2688, ¶ 17 (specimen was unrefrigerated for 12 hours); *State v. DeJohn*, 5th Dist. No. 06-CA-16, 2007-Ohio-163, ¶ 18 (specimen was unrefrigerated for 17 hours).

{¶ 33} The variance among these decisions illustrates the difficulty for courts in applying a vague substantial-compliance standard.  And although a person might not question whether failing to refrigerate a specimen for 63 minutes constitutes substantial compliance with a regulation that requires refrigeration, a person certainly might question why failing to refrigerate a specimen for 18 hours constitutes substantial compliance.  The majority opinion does not resolve that question.  Nor does the regulation in its current form.

{¶ 34} Given the vagaries that remain in applying the current regulation, even after *Burnside*, the bright-line approach used by the majority is tempting.  But the majority's blanket holding that failing to refrigerate a specimen for a four-to-

12

five-hour period is a de minimis error essentially rewrites the regulation to permit such a variation (notwithstanding that any number of facts could play out in a four-to-five-hour period). This approach risks "subvert[ing] the rule-making authority and the statutory mandate of the Director of Health," which we warned against in *Burnside*. *Id.,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 32. "Indeed, the General Assembly instructed the Director of Health—and *not* the judiciary—to ensure the reliability of alcohol-test results by promulgating regulations precisely because the former possesses the scientific expertise that the latter does not." (Emphasis sic.) *Id.*

{¶ 35} If the state's burden to show substantial compliance under the *Burnside* test is to have any relevance, courts must have the information needed to assess what constitutes a de minimis error. Guidance from the director of health regarding the purpose of the procedures in the regulations and the effect that noncompliance has on the reliability of the test will allow judges to avoid the type of speculation that was criticized in *Burnside*—speculation about why the director of health adopted a given regulation. *Id.* at ¶ 29. But it is simply unclear what conditions the regulation is intended to ensure by requiring refrigeration.

{¶ 36} A prior version of the regulation required refrigeration at no more than 42 degrees Fahrenheit. *See State v. Plummer*, 22 Ohio St.3d at 294, 490 N.E.2d 902. But the regulation no longer contains a temperature requirement and does not explain the purpose of keeping the specimen refrigerated. And there is no requirement that the samples be refrigerated when *in* transit—even if that transit takes days or weeks. Still, if a sample is unrefrigerated when not in transit, is the ambient temperature relevant? If it is, then it seems that the substantial-compliance determination should take into account whether the unrefrigerated sample was stored in a hot car or in a climate-controlled building.

{¶ 37} In *Plummer*, we noted that there was research concluding that refrigeration reduces vapor loss of alcohol in specimens, meaning that failure to

refrigerate a specimen would benefit a defendant. *Id.* at 295, fn. 2. If that research, which was done before the modern evidentiary standards imposed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny, is accepted by the director of health, and an unrefrigerated sample does not prejudice a defendant, is a *Burnside* analysis even necessary in these cases?

**{¶ 38}** The key to obtaining clarity regarding substantial compliance resides with the director of health and his scientific expertise rather than with the courts. Until the director of health indicates the purpose of the procedures set forth in the regulations, Ohio's courts will continue to produce varying decisions by engaging in analyses that "subvert the rule-making authority and the statutory mandate of the Director of Health." *Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 32.

**{¶ 39}** I therefore concur separately to emphasize the need for guidance in the regulations.

LANZINGER, J., concurs in the foregoing opinion.

––––––––––––––––––

**O'NEILL, J., dissenting.**

**{¶ 40}** Respectfully, I must dissent.

**{¶ 41}** One man lies dead and another man faces a lengthy prison term if convicted of drunk driving. This is no time to be treating the rules regarding admissibility of evidence lightly. They are designed to guarantee, as much as possible, the accuracy of test results that are being admitted to help either convict or acquit a citizen charged with a very serious crime.

**{¶ 42}** The Ohio State Highway Patrol does not write the rules for admissibility of evidence in the state of Ohio. The General Assembly enacted a statutory standard for determining admissibility of results of blood and urine tests. R.C. 4511.19(D)(1). The statute calls on the experts at the Ohio Department of

Health ("ODH") to adopt "satisfactory techniques or methods" for testing bodily substances for alcohol or drugs of abuse. *Id.* and R.C. 3701.143. This court then made it relatively easy to have the results of these tests admitted into evidence by allowing substantial compliance with the rules rather than requiring strict compliance. *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, paragraph one of the syllabus.

{¶ 43} Starting with *State v. Steele*, 52 Ohio St.2d 187, 370 N.E.2d 740 (1977), this court has been scrupulous in safeguarding the rights of the accused while at the same time recognizing the impossibility of requiring strict compliance in these matters. In *Steele*, the court permitted the results of a breathalyzer test to be admitted despite a minor deviation from the 20-minute rule for observation of an accused before the administration of a breath test. In that case, the police officer did not observe the accused during the time it took the officer to exit his vehicle and walk around to the front passenger door. *Id.* at 187. We later cited *Steele*, stating, "[T]here is leeway for substantial, though not literal, compliance" with the ODH regulations. *State v. Plummer*, 22 Ohio St.3d 292, 294, 490 N.E.2d 902 (1986). I can readily agree that "strict compliance is not always realistically or humanly possible." *Id.* As a result of the practical impossibility of requiring strict compliance with the rules, we have lowered the evidentiary standard for admitting scientific test results in drunk-driving cases well below the standard for scientific test results used in virtually any other proceeding in Ohio.

{¶ 44} But today, the majority treats the substantial-compliance standard as a license to ignore the ODH regulations altogether. The ODH regulation at issue, Ohio Adm.Code 3701-53-05(F), clearly and unequivocally requires refrigeration of the sample when it is not in transit or under examination. And in this case, the sample was left unrefrigerated for over four hours when it was not in transit or under examination. It is outrageous that the General Assembly assigned to experts the task of setting rules to ensure that accurate test results are admitted in drunk-

driving cases only to have the rules ignored by an Ohio State Highway Patrol Trooper because, according to the trooper, "[t]hat's not a procedure of [the Ohio State Highway Patrol's]."

{¶ 45} In the matter before us, the state, and apparently the majority, are now ready to accept that a total failure to comply equates to substantial compliance. This defies logic. As Chief Justice O'Connor so accurately argues in her concurring opinion, it is time for the ODH to take another look at the rules. The courts could use some guidance in determining which procedures are important for obtaining accurate results and which are not. But under no circumstances is it the role of the Ohio State Highway Patrol to decide which of these rules must be complied with. A total failure to comply with the rules is not substantial compliance, and to hold otherwise is an assault on the English language.

{¶ 46} To be clear, a total failure to comply with the rules does not equate to substantial compliance. Justice requires this court to enforce the rules with consistency and logic.

{¶ 47} Respectfully, I dissent.

_____

Nicholas A. Iarocci, Ashtabula County Prosecuting Attorney, and Shelley M. Pratt, Assistant Prosecuting Attorney, for appellant.

William P. Bobulsky, for appellee.

Michael DeWine, Attorney General, and Eric E. Murphy, State Solicitor, and Peter T. Reed, Deputy Solicitor, urging reversal for amicus curiae state of Ohio.

John Murphy, Executive Director of Ohio Prosecuting Attorneys Association; and Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Brett Hammond and Daniel T. Van, Assistant Prosecuting Attorneys, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

_____